DON MILES AND BARBARA MILES, NATURAL PARENTS AND NEXT FRIENDS OF TRAIG WILLIAM MILES, A MINOR CHILD, APPELLEES, V. BOX BUTTE COUNTY, NEBRASKA, A POLITICAL SUBDIVISION, DOING BUSINESS AS BOX BUTTE GENERAL HOSPITAL, APPELLANT.

489 N.W.2d 829

Filed October 2, 1992.    No. S-89-310.

Edward F. Noethe and Joseph F. Bataillon, of Sodoro, Daly & Sodoro, for appellant.

William A. Wieland, of Healey Wieland Law Firm, and Dennis M. Mahoney for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

BOSLAUGH, J.

The plaintiffs, Don and Barbara Miles, brought this action pursuant to the Political Subdivisions Tort Claims Act, Neb. Rev. Stat. §§ 13-901 through 13-926 (Reissue 1991), on behalf of their minor son, Traig William Miles, to recover damages, including post-majority-age medical costs, care costs, lost earnings, pain, disfigurement, and mental anguish, which were or will be incurred by Traig as a result of injuries occurring in connection with his birth on May 29, 1980. According to the defendant's brief, Don and Barbara Miles also sued on their own behalf, but the district court found that their claims were time barred.

After a bench trial the district court awarded damages in the amount of $1,589,280. The defendant, Box Butte County, the political subdivision which operated Box Butte General Hospital, has appealed from the judgment. Dr. Wendell Fairbanks, the attending physician, was also named as a

defendant in the action; however, Dr. Fairbanks and the plaintiffs reached a settlement in the amount of $25,000 prior to trial.

Box Butte County alleges that the district court erred in failing to find that the plaintiffs failed to prove compliance with the Political Subdivisions Tort Claims Act, finding that the county was negligent and that any alleged negligence was the proximate cause of any damage to the plaintiffs, failing to grant a new trial based upon newly discovered evidence, allowing into evidence a certain publication, failing to allow the testimony of an expert witness, receiving into evidence projections and related exhibits of future care costs and lost future earnings which were not discounted to present values, and allowing testimony and receiving into evidence certain exhibits concerning annuities.

Although not relevant in our consideration of this appeal, we note that a "Consent to Order of Revivor and Substitution of Party for Deceased Plaintiff" filed with this court on December 5, 1990, shows that Traig Miles is now deceased. The defendant's brief in resistance to the plaintiffs' motion for summary affirmance states that "[s]ubsequent to the verdict Traig William Miles was killed in a train accident."

The findings of the trial court in an action under the Political Subdivisions Tort Claims Act have the effect of jury findings and will not be disturbed on appeal unless clearly wrong. *Stauffer v. School Dist. of Tecumseh*, 238 Neb. 594, 473 N.W.2d 392 (1991); *Kumar v. Douglas County*, 234 Neb. 511, 452 N.W.2d 21 (1990); *Ohnstad v. Omaha Public Sch. Dist. No. 1*, 232 Neb. 788, 442 N.W.2d 859 (1989). Furthermore, in reviewing a judgment awarded in a bench trial of a law action, the Supreme Court does not reweigh evidence, but considers the judgment in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Ohnstad v. Omaha Public Sch. Dist. No. 1, supra.* Thus, in reviewing the findings of the trial court, we presume the court resolved any controverted facts in favor of the plaintiff, and we will consider the evidence and permissible inferences therefrom most favorably to the plaintiff. *Schmid v.*

*Malcolm Sch. Dist.*, 233 Neb. 580, 447 N.W.2d 20 (1989).

Traig Miles, the son of Don and Barbara Miles, was born at 10:40 a.m. on May 29, 1980, at Box Butte General Hospital, which is located in Alliance, Nebraska. Dr. Wendell Fairbanks cared for Barbara Miles during her pregnancy.

On May 24, 1980, Dr. Fairbanks determined that Barbara Miles was suffering from preeclampsia and admitted her to Box Butte General Hospital. Preeclampsia was described by Dr. Fairbanks as "a group of symptoms that occur only in the last three months of pregnancy and are characterized by the elevation of blood pressure, protein in the urine, and usually edema." Barbara Miles was hospitalized by Dr. Fairbanks because preeclampsia may progress to eclampsia. According to Dr. Fairbanks, eclampsia is characterized by seizures in the mother which often result in a stroke or permanent injury to or death of the fetus. Preeclampsia can cause stress to the fetus and is a "roadmark" for placental insufficiency.

Placental insufficiency is described as a condition in which the placenta is doing an inadequate job of transferring oxygen and other chemicals from the maternal circulation to the fetal circulation, and carbon dioxide and other wastes from the fetal circulation to the maternal circulation. The plaintiffs' expert, Dr. Vincent Miles, a pediatric cardiologist who is not related to the plaintiffs, testified that preeclampsia can lead to placental insufficiency and result in the fetus' being starved for oxygen. A preeclamptic mother is considered by physicians to be a high-risk patient.

On the morning of May 27, 1980, Dr. Fairbanks determined that Barbara Miles' condition had improved, so he discharged her from the hospital. Later that day, Dr. Fairbanks left Alliance and apparently traveled to Hastings, Nebraska. At approximately 10:30 p.m. that same day, Barbara Miles was readmitted to Box Butte General Hospital by a Dr. Forney, an associate of Dr. Fairbanks' who was covering Dr. Fairbanks' practice while Dr. Fairbanks was out of town. Although Barbara Miles apparently was not in labor, she was readmitted to the hospital because her mucous plug had broken.

Because Dr. Forney was the admitting physician, the procedure at Box Butte General Hospital was that the staff

would follow Dr. Forney's standing orders for obstetrical patients. Dr. Forney's orders did not require nursing staff to attach a fetal heart monitor to Barbara Miles. The record shows that in 1980, some doctors in Alliance wanted the fetal heart monitor attached to their obstetric patients as soon as the patient arrived in the delivery room, while other doctors did not use the fetal heart monitor.

On the following day, May 28, 1980, Barbara Miles was attended to by Nurse Jane McConkey, an employee of the hospital. Nurse McConkey's duties at Box Butte Hospital on May 28, 1980, were not limited to caring for obstetrical patients, but she was also responsible for tending patients in the hospital's emergency room. At the trial, which began November 1, 1988, Nurse McConkey had no independent recollection of caring for Barbara Miles on May 28, 1980. Nurse McConkey relied upon hospital records in order to testify as to specific events which may have occurred on May 28, 1980. Similarly, Dr. Fairbanks also relied upon hospital records to attempt to recall what occurred on that date.

At approximately 8:15 p.m. on May 28, 1980, Barbara Miles was moved to a labor room in the hospital and a fetal heart monitor was attached to her. The function of a fetal heart monitor is to measure and chart an expectant mother's contractions and simultaneously measure and chart the rate of the fetus' heartbeat, which is referred to as the fetal heart rate. The charts or "tracings" derived from a fetal heart monitor can be used to measure changes in a fetal heart rate in relation to the mother's contractions, and may indicate fetal distress.

One indication of fetal distress is a "deceleration," which is a reduction in the fetal heart rate which may occur in response to a uterine contraction. A "late deceleration" is suggestive of placental insufficiency and may indicate that the fetus is in a hypoxic state. A late deceleration is indicated when the fetal heart rate does not return to the baseline rate until after a contraction. Placental insufficiency can be alleviated, at least to some extent, by hydrating and oxygenating the mother, and by turning the mother on her side.

After the fetal heart monitor was attached to Barbara Miles at approximately 8:15 p.m. on May 28, 1980, Nurse McConkey

noted a baseline fetal heart rate of 156 to 160 beats per minute and recorded this information in Barbara Miles' hospital chart. Nurse McConkey also recorded a note which, when medical abbreviations are translated, states: "Note marked decelerations to 80 with contractions. Returns to baseline in 10 seconds after contractions." Nurse McConkey also noted that Barbara Miles' contractions were mild to moderate, lasting 45 seconds, and that the patient "seems tired."

Immediately following that note is another recorded by Nurse McConkey at approximately 8:55 p.m. on May 28. The 8:55 note, when medical abbreviations are translated, states: "Continues to have variable decelerations to 80 with contractions. Return to baseline 10 seconds. Encouraged to move in bed to sides." Another note, which was recorded at 9:20 p.m., indicates that Barbara Miles is "up to walk in halls." Although the record shows that Barbara Miles was disconnected from the fetal heart monitor at approximately 9:22 p.m., the evidence at the trial does not show who removed her from the fetal heart monitor. The record indicates that the fetal heart monitor may have been disconnected by Dr. Fairbanks.

While Nurse McConkey was unable to recall whether she summoned Dr. Fairbanks to the hospital on May 28, Dr. Fairbanks' testimony indicates that his usual practice was to telephone the hospital when he returned from a trip. At 10 p.m., Nurse McConkey charted that Dr. Fairbanks was in the hospital seeing Barbara Miles. According to Nurse McConkey, 10 p.m. is not necessarily reflective of the time at which Dr. Fairbanks arrived at the hospital, but only reflects the time at which Nurse McConkey first saw him. Dr. Fairbanks' testimony indicates that before Nurse McConkey charted his appearance at the hospital, Dr. Fairbanks had conducted a sterile vaginal examination of Barbara Miles. Nurse McConkey testified that she was not with Dr. Fairbanks when he conducted the vaginal examination or she would have charted it in the hospital records. According to Don Miles, Dr. Fairbanks was in Barbara Miles' hospital room for "half an hour or forty-five minutes to an hour."

While Dr. Fairbanks' standing orders required an expectant

mother to be connected to a fetal heart monitor when she was in active labor, the record establishes that Barbara Miles was not in active labor on May 28. Dr. Fairbanks' orders therefore did not require that a fetal heart monitor be attached to her immediately after she had been examined by Dr. Fairbanks.

At 10 p.m., Dr. Fairbanks verbally ordered Nurse McConkey to give Barbara Miles a quarter of a grain of morphine sulfate and a grain of Seconal as a suppository. The effect of these drugs is to stop labor and allow a patient to rest. Morphine sulfate is a narcotic for pain and has a sedative effect. Seconal is a barbiturate for sedation and sleep. Morphine sulfate and Seconal would sedate the fetus as well as the mother.

While Dr. Fairbanks issued orders to administer morphine sulfate and Seconal at 10 p.m., the record also shows that Dr. Fairbanks' standard practice was to examine a patient and review hospital records prior to issuing such orders. Thus, although Dr. Fairbanks relied upon Nurse McConkey's notes to testify that he arrived at the hospital at 10 p.m., the record convincingly establishes that he arrived at the hospital prior to 10 p.m.

At trial, neither Nurse McConkey nor Dr. Fairbanks had an independent recollection of their 10 p.m. conversation. Nurse McConkey assumes that she talked with Dr. Fairbanks, because she recorded in her notes that he gave her verbal orders. Nurse McConkey testified that her standard practice in 1980 when she saw a physician was to review with the physician all that had occurred while she had been taking care of a patient. The information reviewed would have included the nursing notes, vital signs, vaginal examinations, character of the bag of water and fluid, character of the contractions, and any fetal heart monitor tracings which had been produced. Nurse McConkey testified that Dr. Fairbanks normally wanted a thorough report and that his standard practice was to review the fetal heart monitor tracings. She recalled that he often reviewed such tracings and discussed the patterns with nurses on duty in the hospital. However, Nurse McConkey does not recall whether she physically placed the Miles fetal heart monitor tracings in front of Dr. Fairbanks for his review on May 28, 1980.

When examined by the plaintiffs' attorney, Dr. Fairbanks

stated that his "usual practice is to talk to the nurses about the patients and check the labor record and examine the patients." Dr. Fairbanks also testified that on May 28, 1980, he would have received information concerning Barbara Miles by reading the nurses' notes in the hospital charts. Dr. Fairbanks then provided the following testimony concerning the question whether he had seen the fetal heart monitor tracings on May 28:

Q. Did you look at the monitor tracings?

A. I have no record that I looked at the monitor tracings.

Q. Do you believe that you looked at the monitor tracings?

A. I think I probably would not have looked at the tracings when I saw the nurses [sic] notes.

Q. Why would you not have looked at the monitor tracings?

A. Because the description is pretty exact there, "Noting marked decelerations to 80, but return to base line 10 seconds." That's a pretty benign pattern.

Although he testified that he "probably would not have looked at the tracings when I saw the nurses [sic] notes," Dr. Fairbanks also testified that the fact that he expected complications with a patient might cause him to seek out and review a fetal heart monitor tracing. According to Dr. Fairbanks, he would have followed Barbara Miles more closely than someone who had not had preeclampsia or other prenatal problems. Dr. Fairbanks also testified that the Miles fetal heart monitor tracing was "always available" for him to see if he had wanted to see it.

When asked what he deduced about Barbara Miles' status from reading Nurse McConkey's notes, Dr. Fairbanks testified:

It looks like she was doing well. They had several notes about the decelerations down to 80 with contractions but returns to base line within 10 seconds after the contraction. That's what we call a variable contraction and is usually caused by cord compression and usually relieved by changing position of the patient and, since it returns to the base line in 10 seconds, it's not an ominous finding.

With respect to the fetal heart monitor tracing, Dr. Fairbanks testified that the tracing's variable pattern was

> not of . . . concern, but there's a rather late component to it, or these decelerations.
>
> . . . .
>
> . . . Typically, all of these have the pattern of being a variable in that they drop rather abruptly and come up rather abruptly. But deceleration begins after— At or after the peak of the contraction and the lowest point falls after the highest point of the contraction, and that is of some concern.

When asked what his course of conduct would have been if he had seen the monitor tracing or if he had been given a description of it, Dr. Fairbanks testified that he would have consulted an obstetrician in Scottsbluff for a second opinion, and would have arranged for delivery by cesarean section if the obstetrician had recommended such action. According to Dr. Fairbanks, a cesarean operation could have been commenced within 45 minutes of the time it was determined that such an operation was required.

Barbara Miles also testified at the trial. When asked what she recalled about the night of May 28, 1980, she testified:

> I remember when Dr. Fairbanks came down and he came in and asked me what I was doing there. I told him that was a silly question and that I was there having a baby. I asked him when I would deliver and he said that he was too tired and that I was too tired and that we would try the next morning.

Numerous expert witnesses, including nurses and physicians, testified on behalf of the plaintiffs. Four nurses appearing on behalf of the plaintiffs collectively testified that Nurse McConkey failed to meet the proper standard of care by failing to (1) properly interpret the fetal heart monitor tracing, (2) hydrate and oxygenate Barbara Miles, (3) notify Barbara Miles' physician, and (4) place the fetal heart monitor tracings in front of Dr. Fairbanks for his review when he appeared at the hospital. The plaintiffs' experts also testified that the proper standard of care was breached because the fetal heart monitor was disconnected at 9:22 p.m. and because Nurse McConkey

failed to remain in the labor room with Barbara Miles after a "nonreassuring" fetal heart pattern had been recorded.

As noted previously, Traig Miles was born at 10:40 a.m. on May 29, 1980. Prior to his death, Traig suffered from retardation and cerebral palsy caused by a lack of oxygen and inadequate blood flow to the brain during the process of labor and delivery. The record, when viewed most favorably to the plaintiffs, shows that if Traig had been delivered by midnight on May 28, 1980, or in the early morning on May 29, 1980, it is likely that Traig would not have suffered retardation or cerebral palsy.

The defendant first argues that the district court erred in failing to find in its favor because the plaintiffs failed to prove compliance with the notice of claim requirement of the Nebraska Political Subdivisions Tort Claims Act.

As a limitation on a plaintiff's right to commence a negligence action against a political subdivision, compliance with the notice requirement of § 13-905 of the Political Subdivisions Tort Claims Act is a procedural precedent to commencement of the negligence action.

Noncompliance with the notice requirement is a defense to a plaintiff's action. If a political subdivision, by an appropriately specific allegation in a demurrer or answer, raises the issue of a plaintiff's failure to comply with the notice requirement of § 13-905, the plaintiff then has the burden to show compliance with the notice requirement. *Millman v. County of Butler*, 235 Neb. 915, 458 N.W.2d 207 (1990). However, a general denial in the political subdivision's answer does not raise the issue of noncompliance, which must be raised as an affirmative defense specifically expressing the plaintiff's noncompliance with the notice requirement of § 13-905 of the Political Subdivisions Tort Claims Act. *Id.*

In its amended answer to the plaintiffs' amended petition, the defendant affirmatively alleged: "Plaintiffs, Don and Barbara Miles, failed to timely file claims pursuant to the Political Subdivision Tort Claim [sic] Act and are therefore barred from claims and damages for which they *individually* may have been entitled to claim." (Emphasis supplied.) With this allegation, the defendant appears to allege that Don and

Barbara Miles, as *individual* plaintiffs, failed to file a notice of claim within 1 year of the time their claims accrued, as required by § 13-919. A review of the pretrial conference confirms that such is the case:

> THE COURT: Now, you raised an issue, Mr. Zimmerman [defendant's attorney], as to lack of compliance by the Plaintiffs with [the Political Subdivisions Tort Claims Act]. I gather, that you are saying with respect to any cause of action that the parents might have there was no compliance?
>
> MR. ZIMMERMAN: Correct.
>
> THE COURT: And they have not sued in that capacity?
>
> MR. ZIMMERMAN: I don't think so. I think Bill and I even talked about that, and he indicated that the parents were not making an independent claim for their damage.

This exchange during the pretrial conference makes it clear that the issue of noncompliance with the Political Subdivisions Tort Claims Act was raised only with respect to claims which Don and Barbara Miles may have had individually. The defendants did not affirmatively allege that the plaintiffs failed to comply with the Political Subdivisions Tort Claims Act with respect to the claims made by Don and Barbara Miles on behalf of their son.

In paragraph 12 of the amended petition, which was filed on February 9, 1988, the plaintiffs alleged the following:

> That on July 1, 1987, pursuant to the provisions of the Political Subdivisions Tort Claims Act . . . plaintiffs filed their Political Subdivision Tort Claim with the County Clerk of Box Butte County, Nebraska; . . . plaintiffs . . . have withdrawn their claim from consideration by the governing body of said county for the reason that the defendant county did not make final disposition of the claim within six months after its filing.

The defendant's amended answer to the plaintiffs' amended petition generally denied this and other allegations contained within the amended petition, but with respect to Traig Miles' claim, the defendant did not affirmatively allege in its amended answer that the plaintiffs had failed to comply with the notice requirement of § 13-905. Consequently, the defendant county's

first assignment of error has no merit. See *Millman v. County of Butler, supra*.

The county next contends that the district court erred in finding that the county was negligent and that any alleged negligence proximately caused Traig Miles' retardation or cerebral palsy.

As stated in *Wees v. Creighton Memorial St. Joseph's Hospital*, 194 Neb. 295, 297-98, 231 N.W.2d 570, 573 (1975): " 'The proper measure of the duty of a hospital to a patient is the exercise of that degree of care, skill, and diligence used by hospitals generally in the community where the hospital is located or in similar communities.' " Furthermore, in an action for negligence, the burden is on the plaintiff to show that there was a negligent act or omission by the defendant and that such an act or omission was the proximate cause of the plaintiff's injury, or was a cause which proximately contributed to it. *Wees, supra*.

As noted previously, a number of physicians and nurses appeared as expert witnesses on behalf of the plaintiffs, testifying that Box Butte County, through its employee Nurse McConkey, was negligent in several ways. The plaintiffs' experts, in part, testified that in light of the presence of a "nonreassuring" fetal heart pattern, Nurse McConkey was negligent in failing to remain in the labor room with Barbara Miles, in failing to hydrate and oxygenate Barbara Miles, in failing to contact her physician, and in disconnecting and failing to reconnect the fetal heart monitor.

First considering Nurse McConkey's alleged failure to contact Barbara Miles' physician, we determine the record lacks sufficient evidence to support a finding that Nurse McConkey committed such an omission. At trial, more than 8 years after the occasion of her alleged negligence, Nurse McConkey understandably could not recall whether she had contacted Dr. Fairbanks on May 28, 1980. However, the record does show that Nurse McConkey recorded a note at 8:55 p.m. which indicated continued decelerations in the fetal heart rate, and that by 10 p.m. Dr. Fairbanks had arrived at the hospital and, apparently, had reviewed the hospital charts and examined Barbara Miles. In light of that evidence, it appears likely that

the hospital staff did contact Dr. Fairbanks.

With respect to the hospital's alleged negligence in disconnecting the fetal heart monitor, the record fails to support a finding that the fetal heart monitor was, in fact, disconnected by hospital personnel. Given the evidence which was presented at trial, it is speculative whether the fetal heart monitor was disconnected by Dr. Fairbanks when he examined Barbara Miles or whether, instead, the monitor was disconnected by hospital staff. The burden of proving a cause of action is not sustained by evidence from which a finder of fact can arrive at a conclusion only by guess, speculation, conjecture, or choice of possibilities; there must be something more which would lead a reasoning mind to one conclusion rather than to another. See *Shibata v. College View Properties*, 234 Neb. 134, 449 N.W.2d 544 (1989).

Furthermore, even if it were to be conceded that Nurse McConkey was negligent in failing to remain in the labor room with Barbara Miles, in failing to hydrate and oxygenate Barbara Miles, in failing to contact her physician, and in disconnecting and failing to reconnect the fetal heart monitor, the record does not support a finding that the hospital's negligence proximately caused Traig Miles' retardation or cerebral palsy. This is so because the evidence presented at trial establishes that it is unlikely that Traig would have suffered the oxygen deficiency which resulted in his condition if he had been delivered very early on the morning of May 29; and because Dr. Fairbanks, rather than hospital staff, directed and controlled Barbara Miles' care after Dr. Fairbanks arrived at the hospital prior to 10 p.m. on May 28. Thus, it is unlikely that Traig suffered any irreversible harm prior to May 29. When Dr. Fairbanks arrived at the hospital, he had full control over treatment which Barbara Miles and her child were to receive.

As indicated by the testimony of the plaintiffs' expert witness Dr. John Yeast, the physician is primarily responsible for and makes the ultimate decisions regarding the course of care of a patient. "As a general rule, hospital staff members lack authority to alter or depart from an attending physician's order for a hospital patient and lack authority to determine what is a proper course of medical treatment for a hospitalized patient."

*Jensen v. Archbishop Bergan Mercy Hosp.*, 236 Neb. 1, 8, 459 N.W.2d 178, 183 (1990). Consequently, a hospital generally cannot be held liable for a patient's injury on the theory that nurses or other members of the hospital staff should have known that the treatment generated by a physician was inadequate or improper and therefore should have intervened. See *Jensen v. Archbishop Bergan Mercy Hosp., supra*. Thus, under the circumstances presented in this instance and barring other negligence on the part of the hospital, the hospital could not be held liable for the course of treatment pursued by Dr. Fairbanks.

This, however, leaves Nurse McConkey's alleged negligence in failing to properly interpret the fetal heart monitor tracings and her alleged negligence in failing to show Dr. Fairbanks the fetal heart monitor tracings to be considered. With respect to Nurse McConkey's alleged failure to show Dr. Fairbanks the fetal heart monitor tracings, we think it is questionable whether hospital staff members are required to physically place in front of a doctor any important information which may be relevant to the care of a patient. Certainly a hospital has a duty to notify a physician of significant changes in a patient's medical status. See *George v. LDS Hosp.*, 797 P.2d 1117 (Utah App. 1990). However, when a physician is present at a hospital and is seeing a patient, and when the physician is clearly aware of available information which may be relevant to the diagnosis and treatment of that patient, it is unreasonable to require hospital personnel to make sure that the physician does, in fact, review that information.

Regarding Nurse McConkey's alleged negligence in failing to properly interpret the fetal heart monitor tracings, Nurse McConkey recorded in Barbara Miles' labor record: "Note marked decelerations to 80 with contractions. Returns to baseline in 10 seconds after contractions." Nurse McConkey later wrote: "Continues to have variable decelerations to 80 with contractions. Return to baseline 10 seconds. Encouraged to move in bed to sides."

Several expert witnesses appearing on behalf of the plaintiffs testified that the notes recorded by Nurse McConkey failed to properly describe the pattern of the fetal heart rate. Dr. Vincent

Miles, for example, testified that in some instances the fetal heart rate did not return to the baseline rate of 156 to 160 beats per minute until 40 to 50 seconds after a contraction. In addition, plaintiffs' experts testified that Nurse McConkey mischaracterized the decelerations as "variable," when at least some of the decelerations were "late" decelerations.

However, the plaintiffs' expert witnesses also testified that the fetal heart rate patterns were "subject to interpretation" and consistently testified that the notes recorded by Nurse McConkey indicated a "nonreassuring" fetal heart rate pattern which would alert them to possible fetal distress. The testimony of nurses and physicians appearing on behalf of the plaintiffs indicates that the pattern described in Nurse McConkey's notes would cause them to take further action in investigating the fetal heart rate or cause them to seek out and review the fetal heart monitor tracings. Plaintiffs' expert Dr. Miles testified: "There is a note here that's crying for action. There's a note here that says, 'marked decelerations with [sic] 80 with contractions.' I mean, that's demanding action."

If we assume that Nurse McConkey did misinterpret the fetal heart monitor tracings, in light of Dr. Fairbanks' presence at the hospital and his examination of Barbara Miles prior to 10 p.m., misinterpretation by Nurse McConkey of the tracings was not a cause proximately contributing to Traig Miles' condition unless Dr. Fairbanks, in fact, did not see the fetal heart monitor tracings, and unless her misinterpretation adversely affected Dr. Fairbanks' course of treatment. The duty was upon Dr. Fairbanks rather than the hospital to diagnose Traig Miles' hypoxic state and his fetal distress and dictate a course of treatment designed to remedy that condition. See *Jensen v. Archbishop Bergan Mercy Hosp., supra.*

At trial, however, Dr. Fairbanks did testify that he "probably would not have looked at the tracings when I saw the nurses [sic] notes . . . [b]ecause the description is pretty exact there, 'Noting marked decelerations to 80, but return to base line 10 seconds.' That's a pretty benign pattern." Thus, despite Nurse McConkey's testimony that Dr. Fairbanks normally wanted a thorough report and that his standard practice was to review monitor tracings which had been produced, and despite the fact

that Barbara Miles had suffered from preeclampsia and was therefore a high-risk patient, making it more likely that he would seek out the monitor tracings, and despite the fact that Nurse McConkey recorded a note which was, in the words of the plaintiffs' expert, "crying for action," and despite Dr. Fairbanks' testimony that he would have read Nurse McConkey's note, it cannot be said that the record completely fails to support a factual finding that Dr. Fairbanks did not review the fetal heart monitor tracings on May 28, 1980.

Thus, the trial court could find that Dr. Fairbanks did not review the fetal heart monitor tracings on May 28, 1980, and that the note which Nurse McConkey recorded in Barbara Miles' labor record failed to accurately describe the fetal heart rate pattern. The question then is whether Nurse McConkey's inaccurate description of the fetal heart rate pattern adversely affected Dr. Fairbanks' course of treatment and was a cause proximately contributing to the hypoxia which resulted in Traig Miles' retardation and cerebral palsy.

As noted previously, Dr. Fairbanks testified that if he had seen the monitor tracing or had been given a description of it he would have consulted an obstetrician in Scottsbluff for a second opinion, and would have arranged for delivery by cesarean section if the obstetrician had recommended such action. In light of this testimony, the record does contain evidence that the hospital's negligence proximately contributed to Traig Miles' condition. See *London v. Stewart*, 221 Neb. 265, 376 N.W.2d 553 (1985).

When the record is viewed as a whole, the evidence is tenuous at best in establishing that the hospital was negligent and that such negligence proximately resulted in Traig Miles' retardation or cerebral palsy. The record also is suggestive that Dr. Fairbanks' negligence was an efficient intervening cause which resulted in Traig's condition. An efficient intervening cause is the intervening negligence of a third person who has full control of the situation and whose negligence could not have been anticipated, and which negligence breaks the causal connection between the original negligence and the injury. See *Delaware v. Valls*, 226 Neb. 140, 409 N.W.2d 621 (1987).

However, if the effects of a defendant's negligence actively

and continuously operate to bring about harm to another, the fact that the active negligence of a third person is also a substantial factor in bringing about the harm does not protect the defendant from liability; furthermore, if the separate and independent acts of negligence by different persons combine to produce a single injury, each participant is liable for the damage, although one of them alone could not have caused the result. *London v. Stewart, supra.* Given Dr. Fairbanks' testimony that he "probably would not have looked at the tracings" and that he would have consulted an obstetrician and possibly arranged for a cesarean operation if he had seen the fetal heart monitor tracings or been given a description of them, we think the record presented a question of fact as to proximate cause.

The defendant county next alleges that the district court erred in failing to grant it a new trial on the basis of newly discovered evidence that a nurse on duty at the hospital on May 28, 1980, remembered that Nurse McConkey did make a telephone call to Dr. Fairbanks while Don and Barbara Miles were in the labor room on that date.

A motion for new trial on the basis of newly discovered evidence is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *Waite v. A. S. Battiato Co.*, 238 Neb. 151, 469 N.W.2d 766 (1991). Furthermore, newly discovered evidence is not a ground for a new trial where the exercise of due diligence before the trial would have produced it. *Gruenewald v. Waara*, 229 Neb. 619, 428 N.W.2d 210 (1988).

In a journal entry dated March 7, 1989, and filed March 15, 1989, the district court stated:

> The Court finds that the affidavit purporting to authorize a new trial on the grounds of newly discovered evidence is insufficient. The evidence could have been discovered before the trial. According to the record, the hospital is a small one. Nurse McConkey's lack of memory of the incident should have triggered an investigation and interviews with all employees on duty at the time. The evidence would have been uncovered.

The district court then overruled the defendant's motion for

new trial and did not abuse its discretion in doing so. See *Gruenewald v. Waara, supra.*

Furthermore, in order to make a sufficient showing for a new trial grounded upon newly discovered evidence, the proof in support of the new trial motion must show that the evidence is of such a character as to reasonably justify a belief that its admission would probably bring about a different result if a new trial were granted. *Federal Dep. Ins. Corp. v. Swanson,* 231 Neb. 148, 435 N.W.2d 659 (1989). Since the record does not support a finding that Nurse McConkey failed to contact Dr. Fairbanks, it cannot reasonably be expected that the defendant would achieve a different result by offering the newly discovered evidence at a new trial.

The defendant next alleges that the trial court erred in admitting into evidence the publication *An Introduction to Fetal Heart Rate Monitoring* (2d ed. 1975) by Edward H. Hon. In making this claim the defendant cites *Winters v. Rance,* 125 Neb. 577, 251 N.W. 167 (1933), and argues that medical treatises are not admissible as independent evidence of opinions expressed therein.

The problem with the defendant's argument is that the district court did not receive the Hon publication as evidence of anything which was written within that publication. In fact, the plaintiffs did not offer the publication as evidence, but the plaintiffs did use the publication while examining Nurse McConkey in an attempt to show that she was familiar with the publication and had used it in the past. The trial court then admitted the publication into evidence, but the court's comments show that it received the publication only for the limited purpose for which it had been used in examining Nurse McConkey. The court did not receive the publication as independent evidence of opinions expressed therein. Furthermore, the Hon publication is not necessary to support the trial court's findings.

The erroneous admission of evidence in a bench trial of a law action is not reversible error if other relevant evidence, admitted without objection or properly admitted over objection, sustains the trial court's necessary factual findings. In such a case, a reversal is warranted if the record shows that

the trial court actually made a factual determination, or otherwise resolved a factual issue or question, through the use of erroneously admitted evidence. See, *State v. Lomack*, 239 Neb. 368, 476 N.W.2d 237 (1991); *Suess v. Lee Sapp Leasing*, 229 Neb. 755, 428 N.W.2d 899 (1988). In this instance, the defendant has failed to show that the district court committed reversible error in admitting the Hon publication into evidence.

The defendant next asserts that the district court erred in refusing to allow the testimony of Decio Rubano. At trial, the defendant attempted to elicit Rubano's testimony concerning the cost of purchasing an annuity which would cover at least a portion of Traig Miles' care costs after Traig reached the age of majority. Rubano testified at trial that he was the president of Case Management, Inc., a rehabilitation consulting firm, and that he was also the president of Settlement Advisors, which he described as a "brokerage house, and annuity purchasing system."

Rubano's testimony indicates that he has a bachelor of arts degree in speech therapy, that he attended 1 year of law school, and that he apparently has no formal academic training regarding financial planning. His testimony also suggests that he is primarily involved in rehabilitation consulting, that other employees of Settlement Advisors are primarily responsible for purchasing annuities, and that he relies upon the expertise of those employees in purchasing annuity contracts. Furthermore, Rubano would apparently have had to rely upon information provided to him by one of his employees in order to testify as to the cost of purchasing an annuity to cover Traig Miles' care costs. The plaintiffs objected to such testimony on foundational grounds, and the district court upheld the objection, stating: "As I understand this witness' testimony, he has no expertise in annuities. Someone else has that expertise and he's just relaying information that that gentleman that he referred to had secured, and that's the basis for my sustaining the objection."

A trial court is allowed discretion in determining whether a witness is qualified to testify as an expert under Neb. Evid. R. 702, and unless the court's finding is clearly erroneous, such a determination will not be disturbed on appeal. *In re Interest of*

*C. W. et al.*, 239 Neb. 817, 479 N.W.2d 105 (1992). The district court was not clearly wrong in ruling that Rubano did not qualify as an expert witness on the subject of annuities.

The defendant cites *Keim v. Keim*, 228 Neb. 684, 424 N.W.2d 112 (1988), for the proposition that Neb. Evid. R. 703 " 'clearly contemplates admission of an expert's opinion based on hearsay supplying facts or data for that opinion, rather than a requirement of firsthand knowledge as the only source of information for an expert's opinion.' " *Id*. at 688, 424 N.W.2d at 115, quoting *Gibson v. City of Lincoln*, 221 Neb. 304, 376 N.W.2d 785 (1985). However, because Rubano did not qualify as an expert witness, the rule stated in that case does not apply. Consequently, the record shows that the testimony which the defendant attempted to elicit from Rubano was inadmissible hearsay under Neb. Evid. R. 802.

The defendant finally contends that the district court erred in receiving into evidence projections and related exhibits of future care costs and lost future earnings which were not discounted to present values. As stated previously, the erroneous admission of evidence in a bench trial of a law action is not reversible error if other relevant evidence, admitted without objection or properly admitted over objection, sustains the trial court's necessary factual findings. *State v. Lomack, supra*; *Suess v. Lee Sapp Leasing, supra*.

The plaintiffs in this case presented evidence to show that despite his condition, at the time of the trial Traig Miles had a normal life expectancy. The plaintiffs also presented evidence that Traig's mental ability would not progress beyond that of a 3-year-old and that he would never be able to earn a living. The evidence shows that Traig would have continued to incur medical expenses resulting from his condition, that the current cost of "group home" care is $80 to $106 per day, and that such costs have historically escalated at a rate approximately twice the consumer price index. In addition, plaintiffs sought damages for and presented evidence of pain, mental anguish, disfigurement, and disability suffered by Traig Miles as a result of his condition.

As viewed most favorably to the plaintiffs, the record supports the amount of the damages awarded.

Because each of the defendant's assignments of error is without merit, the judgment of the district court must be affirmed.

AFFIRMED.