LONNIE NICKELL, APPELLEE, V. JOHN RUSSELL, INDIVIDUALLY,
APPELLANT, AND JOHN RUSSELL AND DENNIS PESTAL, A
PARTNERSHIP, REAL NAME UNKNOWN, APPELLEE.
525 N.W.2d 203

Filed January 6, 1995. No. S-93-018.

Stephen L. Ahl and Gary L. Dolan, of Wolfe, Anderson, Hurd, Luers & Ahl, for appellant.

David M. Geier and William A. Wieland, of Healey & Wieland Law Firm, for appellee Nickell.

HASTINGS, C.J., WHITE, CAPORALE, FAHRNBRUCH, LANPHIER, and WRIGHT, JJ., and BOSLAUGH, J., Retired.

PER CURIAM.

This case involves an accident in which the defendant John Russell, while operating a pickup truck close to midnight on June 28, 1986, on West Princeton Road in Lancaster County, Nebraska, struck and injured the plaintiff, Lonnie Nickell. Nickell was lying down in the middle of the gravel road. Following a directed verdict as to both Russell's negligence and the absence of contributory negligence on the part of Nickell, the jury returned a verdict for Nickell in the amount of $600,000. Russell appeals, assigning as error generally the trial court's ruling that he was negligent as a matter of law and that Nickell, as a matter of law, was not negligent.

## STANDARD OF REVIEW

A trial court should direct a verdict as a matter of law only when the facts are conceded, undisputed, or such that reasonable minds can draw but one conclusion therefrom. *Lindsay Mfg. Co. v. Universal Surety Co.*, 246 Neb. 495, 519 N.W.2d 530 (1994); *Humphrey v. Nebraska Public Power Dist.*, 243 Neb. 872, 503 N.W.2d 211 (1993). The party against whom the verdict is directed is entitled to have every controverted fact resolved in his favor and the benefit of every inference which can reasonably be drawn from the evidence. *Rohde v. Farmers Alliance Mut. Ins. Co.*, 244 Neb. 863, 509 N.W.2d 618 (1994); *Wilson v. Misko*, 244 Neb. 526, 508 N.W.2d 238 (1993). An appellate court may reverse a directed verdict if evidence exists sustaining a finding for the party against whom the judgment was made. See, *Macholan v. Wynegar*, 245 Neb. 374, 513 N.W.2d 309 (1994); *Marple v. Sears, Roebuck & Co.*, 244 Neb. 274, 505 N.W.2d 715 (1993).

## FACTS

Nickell filed a petition in the district court for Lancaster County against Russell individually, and Russell and Dennis Pestal as a partnership. There is no issue on appeal as to the matter of partnership liability. Nickell alleged that on June 28, 1986, Russell failed to maintain a proper lookout and failed to keep his pickup truck under reasonable control when he ran over Nickell on West Princeton Road. As a result of Russell's alleged negligence, Nickell suffered a traumatic amputation of

his right arm, a fractured right leg, a fractured pelvis, a closed head injury, abrasions, contusions, lacerations, and psychological injury. Nickell sought medical and prosthetic expenses as well as damages for pain and suffering, disability, and disfigurement.

As an affirmative defense, Russell alleged that Nickell's own negligent acts and omissions proximately caused and contributed to Nickell's injuries. Specifically, Russell alleged that Nickell lay down in the road after dark, failed to maintain a proper lookout, and knew or should have known that a motorist traveling on the road would have difficulty seeing a reclining person. Russell also alleged that Nickell was tired when he lay down, which contributed to his negligence. In addition, Russell alleged that Nickell assumed the risk of being struck by a vehicle because he knew and appreciated the danger of reclining on the road while tired, that he voluntarily and deliberately exposed himself to the danger, and that his actions proximately caused his injury.

The events of June 28 are based on testimony adduced at trial from Sgt. Paul Jacobsen of the Lancaster County sheriff's office, who investigated the accident; Nickell; and Russell, from a reading of his deposition and his live testimony at trial.

On June 28, around 10:30 p.m., Nickell, age 17, sneaked out of his parents' farmhouse. According to Nickell, he walked out of the west side of the house, then south through a milo field and on across West Princeton Road. He stood in the south ditch waiting for two friends to pick him up. Nickell waited "maybe 10 or 15 minutes," then became tired of standing and sat down on the side of the road where he noticed that the gravel "sloped up . . . like a pillow." Thus, according to Nickell's statement to Jacobsen, Nickell then lay down on the south shoulder of the road in such a position that he could observe his parents' driveway and the road.

Jacobsen testified that he had the impression that Nickell lay "with his feet facing towards the center of the road or middle of the road, basically pointing in a general direction of his residence, which was north and east, assuming that he was using the gravel pile for a pillow." According to Jacobsen, Nickell had a quarter-mile view of westbound traffic.

Nickell testified that he lay facing east with his feet "partially going to the south . . . They might have been in the ditch there on the south side of the gravel pile." Nickell also testified that he pointed his legs more to the east than to the south. Nickell emphasized that he did not lie down on the road because he "thought about" traffic from the west "just before I can't remember nothing." The next event Nickell recalled after lying down on the south shoulder of West Princeton Road was waking up in the hospital.

According to his deposition, on the day of the accident, Russell had worked in his dental clinic in Beatrice until the afternoon. During the afternoon, he drove to Lincoln and had lunch with a friend, visited with a tenant, went to a movie, had dinner, and then started out to return to Beatrice at about 11 p.m. The record is clear that at no time did Russell consume alcohol.

Russell decided to take a back country route to Beatrice because he wanted to see the Hallam powerplant. He eventually drove westbound on West Princeton Road at a speed of 35 to 40 miles per hour. Jacobsen measured West Princeton Road as 30 feet in width with soft shoulders and loose gravel. The travelable portion of the road was 25 feet wide. At approximately 11:50 p.m., Russell saw an object on the road.

Russell told Jacobsen that he first observed the object when "he started up a rather long hill," but testified at trial that he observed the object while "going up the incline." During cross-examination, Russell testified that he did not intend a discrepancy between "started up" the hill and "going up" the incline. Russell was then asked:

Q. Sure. You told the sheriff, "As I started up a long hill." Your first deposition you said, "Went up a long hill, went over the top and saw the object," and then we took your second deposition and said, "Okay. Which way is it? Is it what you told the sheriff that's accurate or did you drive up over the top of the long hill and then see the object?"

And then in the second deposition you said, "I think what I told the sheriff was more accurate."

A. I would agree with that.

Russell testified that when he crested the hill, he had the impression the object was either a plank, a piece of board, a rag, or hay fallen off a truck. Russell's attention was not particularly drawn to the object, which, at first, did not appear so large that he could not drive over it or around it. Russell estimated during his deposition that the object lay 30 to 40 feet from him when he first observed it. Russell continued to drive at 35 to 40 miles per hour, and as he became more aware of the object, he noticed its large size. Russell told Jacobsen that he contemplated straddling the object, because he did not want to drive around the object on his left while nearing the crest of a hill and did not feel he had room to get around it on the right. Russell gradually slowed down as he approached the object and "suddenly discerned" that it had human form. Russell decided to straddle the form because he believed he did not have time to avoid the object and if he attempted to stop, his brakes would lock and slide into the object. Russell realized the form was a person that lay faceup, perpendicular across the travel lane, "just as he lost sight of the form over the top of his hood." At trial, Russell described the incident as follows:

> I kept driving. As I got closer the object in front of me grabbed my attention more. It seemed to just kind of almost come out of nowhere. As I got to it, just as it was very close to me I had the impression that it was — or it could've been a person or a dummy; and I swerved trying to miss the biggest part of it, trying to keep from getting my wheels on the head and the thorax or upper body of it.

Russell had the impression that just prior to impact, Nickell curled into a fetal position or rolled away from the truck in an attempt to protect himself. Russell applied the brakes as his truck went over the body, and he heard two thumps. Russell stopped the truck "as soon as he could" and turned the truck around. Russell then observed, illuminated by the truck's headlights, a teenage boy, Nickell, lying on the road with his right arm completely severed from his body. Russell put Nickell and his severed arm in the bed of the pickup truck and began driving eastbound on West Princeton Road, when he immediately observed the two teenagers, Bradley Pomajzl and Gaynor Burianek, for whom Nickell had waited, parked in the

Nickells' driveway. Russell requested their assistance, and they helped direct Russell to the Crete hospital.

Jacobsen, as a part of his investigation, in addition to talking to Russell at the Crete hospital, drove to the scene of the accident with Burianek, one of the two teenagers earlier mentioned. At the scene of the accident, Jacobsen observed tire marks on the gravel road indicating a rapid deceleration with locked tires. Jacobsen also observed drag marks with body fluid, flesh, and blood on the gravel road. Jacobsen did not know how Nickell ended up on the traveled part of the road, "but there's no indication that he was still lying on the edge of the road when the accident occurred." Jacobsen testified that it would surprise any motorist to find a person on the road. In his report, however, Jacobsen noted that Russell had adequate time to stop or take evasive action.

Regarding the accident scene, Jacobsen testified as to his observations made with help from Burianek. He made certain measurements and then prepared exhibit 29, a diagram of the accident scene. He located a particular power pole as a point of reference. He located the Nickells' driveway. He then measured the point of impact as 100 feet 10 inches west of the point of reference, a large pool of blood as being 152 feet west of the point of reference, and the final resting place of the victim as 177 feet 6 inches west of the point of reference.

Dr. James Summers, a consulting engineer for R.L. Large and Associates, prepared an accident reconstruction study for Nickell. In that connection, he carried out a land survey, locating various points, including the point of impact, on exhibit 42. The bottom of the hill or the start of the incline was found to be 400 feet east of the point of impact.

Summers then testified that for an average driver, it would take 73.4 feet to stop a vehicle traveling at 35 miles per hour. Assuming Russell's perception time of the object was $^3/_4$ to $1^1/_2$ seconds, 150 feet represents the distance from perceiving the object to stopping the vehicle. Summers also testified that an average driver at 40 miles per hour can stop a vehicle at 96 feet and that the distance from perceiving an object to stopping the vehicle is 184 feet. Summers took into consideration detection of an object as opposed to actually determining the nature of the

object. Assuming that Russell first observed the object when starting up the hill, Summers determined that Russell started to react 400 feet from the object. Summers testified that from 400 feet, Russell could have stopped his truck 280 to 290 feet from Nickell. Assuming that Russell only perceived the object at 400 feet as opposed to reacting, then Summers determined that Russell could have stopped his truck 250 feet from Nickell.

Dr. Ted Sokol, a registered civil engineer specializing in accident reconstruction, testified for Russell. Sokol testified that the $3/4$-second perception time to which Summers referred assumed a well-defined stimulus, and absent a well-defined stimulus, perception time is uncertain. Sokol disputed Summers' testimony by suggesting that mere detection of an object does not necessarily alert a driver. Sokol assumed that Russell drove 30 miles per hour and determined that Russell was 80 feet from Nickell at the time he made the steering maneuver to straddle. Sokol also assumed a minimum perception time of 7.75 seconds and, thus, determined that at 30 miles per hour, Russell began to react 113 feet from Nickell. Assuming that Russell traveled at 35 miles per hour, Sokol determined that he began to react 129 feet from Nickell.

During cross-examination, Nickell's counsel offered an acetate overlay to Sokol's diagram regarding reaction time. The overlay applied braking distance to Sokol's determination of reaction time. When asked to confirm that the overlay showed that had Russell applied the brakes to stop as opposed to attempting a steering maneuver, the truck would have stopped 22 feet from Nickell, Sokol replied, "It appears that way." Nickell's counsel also applied an acetate overlay to depict braking time at 35 miles per hour, which Sokol also agreed "appears" to show that if Russell had attempted to stop rather than straddle the object, he would have come to a complete stop before striking Nickell.

After defense rested, Nickell moved for a directed verdict. Nickell argued that as a matter of law, Russell failed to keep a proper lookout, failed to keep his vehicle under reasonable control, failed to avoid running over Nickell, and operated the vehicle at an excessive rate of speed. Nickell also contended that Russell's negligence proximately caused Nickell's injuries. As

to contributory negligence, Nickell argued that Russell did not introduce evidence to support contributory negligence and, thus, failed to meet his burden of proof.

Russell also moved for a directed verdict, arguing that Nickell failed to prove that Russell could or should have identified the object as a danger, that Nickell failed to prove that Russell caused Nickell's injuries or acted in the scope of a partnership, and that Nickell's contributory negligence was more than slight. Regarding contributory negligence, Russell argued that Nickell knew he placed himself in danger when he lay on the side of the road, that a jury could reasonably infer that Nickell placed himself on the traveled part of the road, and that Nickell was awake and alert at the time of the accident.

The district court denied Russell's motion for directed verdict as to negligence and contributory negligence. The court also denied Nickell's motion for directed verdict as to the defendant partnership's liability.

The court granted Nickell's motion for directed verdict as to Russell's negligence and claim of contributory negligence. The court held that Russell had a duty to keep a proper lookout. The court found that Russell observed an object at 400 feet and at 200 feet chose to straddle the object rather than take evasive action. The court ruled that it was irrelevant whether Russell thought the object was a person and held Russell negligent as a matter of law. Regarding contributory negligence, the court found that Russell did not present "one scintilla of evidence, direct or circumstantial," explaining how Nickell got from the south shoulder of the road to the westbound lane. The court ruled that to submit the issue to the jury would require the jury to base its finding on speculation and conjecture and, therefore, granted Nickell's motion. Afterwards, Russell moved for judgment notwithstanding the verdict or for a new trial, which the district court overruled.

## ANALYSIS

This court has long held that a motorist is deemed negligent as a matter of law if he or she operates a motor vehicle in such a manner as to be unable to stop or turn aside without colliding with an object or obstruction in the motorist's path within his

or her range of vision. See, *Horst v. Johnson*, 237 Neb. 155, 465 N.W.2d 461 (1991); *Edgerton v. Lawry*, 235 Neb. 100, 453 N.W.2d 743 (1990); *Roth v. Blomquist*, 117 Neb. 444, 220 N.W. 572 (1928). When the facts of a case fall within the exception to the range of vision rule, then the determination of negligence becomes a question for the jury. *Converse v. Morse*, 232 Neb. 925, 442 N.W.2d 872 (1989). An exception to the range of vision rule exists when a motorist, otherwise exercising reasonable care, does not see an object or obstruction sufficiently in advance to avoid colliding with it because it is similar in color to the road surface and relatively indiscernible. *Edgerton v. Lawry, supra*; *Burkey v. Royle*, 233 Neb. 549, 446 N.W.2d 720 (1989).

According to evidence adduced at trial, Russell observed an object in the road, chose to straddle the object, and when realizing that the object was a human, decided to continue the straddling maneuver. Russell observed the object at the start of the hill 400 feet from Nickell or while going up the incline at a distance of something less than 400 feet. In any event, agreement exists as to when Russell reacted to the observed object.

Russell concurred with the sheriff's report that he traveled at a rate of speed of between 35 and 40 miles per hour. Sokol, Russell's own witness, determined that at 35 miles per hour, Russell began to react 129 feet from Nickell. Nickell's counsel accepted this, and Sokol testified that it appeared that Russell could have stopped before striking Nickell had he chosen to apply the brakes as opposed to straddling the object. Furthermore, the sheriff's report observed that Russell had adequate time to take evasive action. Russell might have been unable to precisely identify what lay in the road, but he observed a large object in his path and chose to straddle that object even when it appeared to have human form. The range of vision rule was triggered when Russell observed the object in his path. Therefore, the range of vision rule applies, unless the facts of the situation trigger the exception.

In *Guynan v. Olson*, 178 Neb. 335, 133 N.W.2d 571 (1965), a driver observed an object in the road at a distance of between 300 and 400 feet. The driver applied the brakes to the vehicle

and skidded into a man on horseback, injuring the rider and killing the horse. This court noted that the exception to the range of vision rule applies when the motorist cannot see the object in time to avoid it. We held that where a motorist observed an object from approximately 315 feet, then the motorist had time to take evasive action.

In *Allen v. Kavanaugh*, 160 Neb. 645, 71 N.W.2d 119 (1955), a motorist observed a vehicle in his path at 300 feet, at 100 feet he thought the observed vehicle was moving, at 50 feet he became aware that the observed vehicle was stationary, and at 30 feet he applied the brakes too late and collided with the vehicle. We held that the range of vision rule applied because the motorist observed the vehicle within time to make decisions and take evasive action.

Thus, for the exception to the range of vision rule to apply, it is essential that the motorist not see the object. See, *Bartosh v. Schlautman*, 181 Neb. 130, 147 N.W.2d 492 (1966) (exception applied when the color of the struck vehicle blended into the night, rendering it not visible in time to avoid); *Heeney v. Churchill*, 154 Neb. 848, 50 N.W.2d 72 (1951) (exception applied when motorist did not see any obstruction or object prior to running over a body lying in the road). In the present case, Russell observed an unusual object in the road at some point near or slightly less than 400 feet away. At approximately 129 feet from the object, he noted the danger of the situation and decided to straddle the object. Rather than applying the brakes to stop the truck, Russell unsuccessfully tried to run over Nickell without injury. Russell saw an object in his path within time to avoid it; thus, the exception does not apply and Russell is negligent as a matter of law.

Russell relies on this court's holding in *Weisenmiller v. Nestor*, 153 Neb. 153, 43 N.W.2d 568 (1950), to support his argument that he is not negligent as a matter of law. In *Weisenmiller*, the victim walked on the side of the highway and for reasons unknown, ended up in the ditch beside the road with an injured leg. The victim crawled out of the ditch to the edge of the road and blacked out. A motorist spotted the victim lying on the road and attempted to assist, when another vehicle approached. The assisting motorist flashed a spotlight across the

victim's body to enable the oncoming vehicle to see the injured pedestrian. The vehicle did not slow down and ran over the victim. The driver claimed he did not see an object in his path and denied hitting the pedestrian. The trial court granted the driver's motion for a directed verdict. We held that sufficient evidence existed to find the driver negligent based upon the range of vision rule and remanded the issue to the jury. We stated in *Weisenmiller* that if a motorist drives at a speed at which he or she cannot avoid colliding with an object lighted by headlights, then the motorist is negligent as a matter of law. In *Weisenmiller*, however, the issue went to the jury because the trial court erred in granting the defendant's motion for a directed verdict and a dispute existed over the material fact of whether the motorist ran over the victim, who was apparently injured by a previous driver.

Russell also relies on *Sink v. Sumrell*, 41 N.C. App. 242, 254 S.E.2d 665 (1979), and *Hayes v. State*, 80 Misc. 2d 385, 362 N.Y.S.2d 994 (1974). In *Sink* and *Hayes*, the respective courts did not find motorists who ran over persons lying on the road negligent, because the motorists could not reasonably foresee that a person would lie on the road. The Court of Appeals of North Carolina and the Court of Claims of New York, however, do not apply the range of vision rule which governs this issue in Nebraska.

We find that the trial court was correct in directing a verdict in favor of the plaintiff, Nickell, as to defendant Russell's negligence.

Russell's second assignment of error concerns Nickell's alleged contributory negligence. A plaintiff is contributorily negligent if (1) the plaintiff fails to protect himself or herself from injury, (2) the plaintiff's conduct concurs and cooperates with the defendant's actionable negligence, and (3) the plaintiff's conduct contributes to the plaintiff's injuries as a proximate cause. *Mix v. City of Lincoln*, 244 Neb. 561, 508 N.W.2d 549 (1993). However, when the defendant pleads the affirmative defense of contributory negligence without relevant or competent evidence to support the defense, it is prejudicial error to submit the issue to a jury. *Kappenman v. Heule*, 241 Neb. 54, 486 N.W.2d 27 (1992).

Nickell relies on this court's decision in *Weisenmiller v. Nestor, supra*, regarding contributory negligence. In *Weisenmiller*, we held: "In the record before us, we find no competent evidence from which it could be reasonably concluded that plaintiff was placed in a position of peril by his own negligence. . . . True, plaintiff was in a position of peril, but how he got there is not shown." *Id.* at 155, 43 N.W.2d at 570. The facts of *Weisenmiller*, however, differ significantly from the case at bar. In that case, the plaintiff was injured and had possibly been struck by a previous automobile, crawled out of a ditch, and then blacked out. In the present case, a tired Nickell voluntarily lay down on the shoulder and suddenly, without explanation, appeared lying in the middle of the road. Nickell was not injured prior to the accident and did not appear in a position of peril due to intervening events.

Nickell had a duty to act with reasonable care while using the county road. See *Lynn v. Metropolitan Utilities Dist.*, 225 Neb. 121, 403 N.W.2d 335 (1987). Nickell contends he acted lawfully in lying down on the shoulder of the road. He points out that a Nebraska statute allows pedestrians to walk along the shoulder where a sidewalk is unavailable. See Neb. Rev. Stat. § 39-646 (Reissue 1988) (currently Neb. Rev. Stat. § 60-6,156(2) (Reissue 1993)). We similarly held that merely walking along a roadway or on a roadway, without knowledge of approaching danger, does not assume the risk of an accident involving injuries. See *Vanek v. Prohaska*, 233 Neb. 848, 448 N.W.2d 573 (1989). These rules, however, pertain to walking and do not address a pedestrian who chooses to lie down and sleep on the side of the road.

Russell cannot sustain his position as to Nickell's negligence if a jury can arrive at that conclusion only by guess, speculation, conjecture, or choice of possibilities; there must be something more which would lead a reasoning mind to one conclusion rather than to another. See *Miles v. Box Butte County*, 241 Neb. 588, 489 N.W.2d 829 (1992).

Negligence must be proved by direct evidence or by facts from which such negligence can reasonably be inferred. *Vilas v. Steavenson*, 242 Neb. 801, 496 N.W.2d 543 (1993). Evidence does exist for a reasonable mind to conclude that there

was negligence on Nickell's part. The record does not show how Nickell moved from the shoulder of the road to the middle of the road, but the record does show that in the middle of the night, he became tired, propped up a pillow made from gravel, and voluntarily lay down on the shoulder of a narrow, unlit gravel road. He stated that at least he was concerned about a vehicle coming from the opposite direction. This evidence allows a jury to make a reasonable inference as opposed to speculation that he realized the potential of harm to him resulting from his actions.

In *Williamson v. McNeill*, 8 N.C. App. 625, 175 S.E.2d 294 (1970), a motorist allegedly ran over three young men lying on the highway. The motorist alleged that the young men were contributorily negligent in lying on the road. The North Carolina Court of Appeals, in relevant part, held:

> All three boys had severe head injuries, but there is no evidence of any other injuries, or any impact prior to that with the car driven by the defendant. Defendant has speculated that they were playing "chicken," or in view of the evidence that the asphalt was warmer than the unseasonably cool air, that they lay down to get warm and fell asleep. Plaintiff has speculated that someone injured or drugged them and placed them there. A reasonable inference is valid on nonsuit but speculations are not; the only reasonable inference which we may draw in the absence of evidence more compelling than that which is before us now is that intestate, for whatever reason, voluntarily placed himself on the highway. In so doing, he failed to exercise for his own safety the care of an ordinarily prudent person and his negligence was a proximate cause of his unnecessary death.

*Id.* at 628, 175 S.E.2d at 296. Applying Nebraska law, the U.S. Court of Appeals for the Eighth Circuit made a similar conclusion in *Sherman v. Lawless*, 298 F.2d 899 (8th Cir. 1962). In *Sherman*, the motorist was sued in a wrongful death action for fatally injuring a man lying on the traveled path of the road. The trial court found against the motorist, and the Eighth Circuit reversed, holding that substantial evidence on the record supported the conclusion that the decedent's fatal injuries

were inflicted before the defendant's accident. The court also stated:

> Here the evidence conclusively establishes that decedent, as defendant approached, was lying on the traveled path of traffic on a primary highway, on a dark night, in dark clothing. Decedent's action in assuming such a hazardous position, if done voluntarily, would manifest a very high disregard for his own safety, and such conduct, in the absence of any reasonable explanation or excuse therefor, would in our view establish contributory negligence more than slight as a matter of law.

*Id.* at 904. Similarly, given the evidence in this case, a jury did not need to speculate, but could reasonably infer that Nickell acted negligently in lying down on the side of a narrow gravel road.

This court has not directly addressed the negligence of voluntarily lying on the road, but other jurisdictions have found actions analogous to Nickell's to be contributorily negligent. See, *Clemons v. Williams*, 61 N.C. App. 540, 300 S.E.2d 873 (1983) (voluntarily lying on highway held presumptively negligent); *Sink v. Sumrell*, 41 N.C. App. 242, 254 S.E.2d 665 (1979) (quoting *Barnes v. Horney*, 247 N.C. 495, 101 S.E.2d 315 (1958)) (lying asleep on highway or on side of dirt road held negligent as a matter of law); *Hayes v. State*, 80 Misc. 2d 385, 362 N.Y.S.2d 994 (1974) (mere presence of person lying on highway suggestive of contributory negligence); *Duncan v. Dunevant*, 368 F. Supp. 524 (W.D. Ky. 1973) (lying prostrate on paved highway held negligent as a matter of law); *Heffelfinger v. Lane*, 239 Ala. 659, 196 So. 720 (1940) (voluntarily placing self in position of peril on road held contributorily negligent).

Given the facts of the present case, Nickell acted negligently when he voluntarily and knowingly placed himself in a position of peril by lying on the shoulder of a narrow gravel county road at nighttime. Although we do not know how he moved from the shoulder to the traveled part of the road, a jury could reasonably infer, based on the adduced evidence, that only by his own negligence did he find himself in such a dangerous position.

We have held it negligent as a matter of law to cross a road

without looking for oncoming traffic. See *Hennings v. Schufeldt*, 222 Neb. 416, 384 N.W.2d 274 (1986). Common sense dictates that generally it is also negligent to lie down on or beside the road, oblivious to the dangers of traffic. When substantial evidence shows that the plaintiff contributed to the collision, the issue of contributory negligence should be considered by the jury. *McQueen v. Navajo Freight Lines, Inc.*, 293 F.2d 590 (8th Cir. 1961) (citing Neb. Rev. Stat. § 25-1151 (Reissue 1956)). Thus, the district court erred in granting a directed verdict dismissing Russell's claim of contributory negligence.

The judgment of the district court is affirmed in part and in part reversed, and the cause is remanded for a new trial.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED FOR A NEW TRIAL.

HASTINGS, C.J., dissenting.

I respectfully dissent. It would seem almost impossible to find a more egregious act evidencing a disregard for one's own safety than to voluntarily lie down in or alongside the traveled portion of a highway at night. One need not go beyond the cases cited by the majority to support that conclusion.

In *Williamson v. McNeill*, 8 N.C. App. 625, 628, 175 S.E.2d 294, 296 (1970), a case involving injuries and death to a young man who was lying on the pavement and was struck by a motorist, that court said:

> A reasonable inference is valid on nonsuit but speculations are not; the only reasonable inference which we may draw in the absence of evidence more compelling than that which is before us now is that intestate, for whatever reason, voluntarily placed himself on the highway. In so doing, he failed to exercise for his own safety the care of an ordinarily prudent person and his negligence was a proximate cause of his unnecessary death.

Similarly, in *Sherman v. Lawless*, 298 F.2d 899, 904 (8th Cir. 1962), the court stated:

> Here the evidence conclusively establishes that decedent, as defendant approached, was lying on the traveled path of traffic on a primary highway, on a dark night, in dark clothing. Decedent's action in assuming

such a hazardous position, if done voluntarily, would manifest a very high disregard for his own safety, and such conduct, in the absence of any reasonable explanation or excuse therefor, would in our view establish contributory negligence more than slight as a matter of law.

*Weisenmiller v. Nestor*, 153 Neb. 153, 43 N.W.2d 568 (1950), also cited in the majority opinion, is distinguishable. In *Weisenmiller*, the victim apparently had been in an earlier accident, was injured, and found himself in a ditch with an injured foot or leg. He could not walk, and crawled out of the ditch and blacked out. There was no evidence as to how he came to be on the driving portion of the highway.

I would have sustained Russell's motion for a directed verdict.

CAPORALE, J., and BOSLAUGH, J., Retired, join in this dissent.