CENTER STATE BANK, SPECIAL CONSERVATOR OF THE ESTATE OF ROBERT J. HAWK, A MINOR, APPELLANT, V. DANA, LARSON, ROUBAL & ASSOCIATES, INC., A CORPORATION, APPELLEE.

411 N.W.2d 635

Filed September 4, 1987.   No. 86-917.

M.J. Bruckner and John V. Hendry of Bruckner, O'Gara, Keating, Sievers & Hendry, P.C., and Patrick J. Birmingham, for appellant.

Jewell, Gatz, Collins & Dreier, for appellee.

BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

COLWELL, D.J., Retired.

This is a negligence action brought by plaintiff, Center State Bank, as special conservator of the estate of Robert J. Hawk, a minor born September 20, 1970, against Dana, Larson, Roubal & Associates, Inc., a corporation (hereafter DLR), for personal injuries received in the explosion and fire of propane gas escaping from an underground supply tank. Robert J. Hawk (Robert) was seriously burned. DLR was the architectural firm involved in the 1973-76 planning and construction of the Santee Elementary School, Santee, Nebraska. A $281,415.65 jury verdict was entered in favor of plaintiff against DLR.

Plaintiff's motion for a new trial on the issue of damages and defendant's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial were both denied. Plaintiff appeals, assigning as errors that the trial court erred in (1) submitting the issue of contributory negligence of Robert in these particulars: in failing to leave an area which he knew, or in the exercise of reasonable care should have known, was

dangerous, and in going from a place of safety to a place of danger; (2) refusing to admit nine affidavits describing misconduct of the jury foreman; (3) failing to grant a new trial for jury misconduct; (4) failing to grant a new trial because the jury foreman failed to follow instructions when he reduced past damages as well as future damages to present value; (5) failing to submit to the jury Robert's past and future disfigurement; (6) failing to grant a new trial when the verdict was clearly inadequate and the result of passion, prejudice, mistake, and misconduct; and (7) failing to grant a new trial on the issue of damages only.

Propane gas is a commercial name given to liquefied petroleum gas. It is a gaseous heating material that, for transportation and storage, is liquefied under pressure. In the unpressurized liquid state it is about -40 °F, and it is stored in pressurized tanks. When used by the consumer, the pressure is released and the liquid is warmed by a vaporizer, which returns it to its original gaseous state for ignition.

At about 4 p.m. on August 26, 1983, Sam Ruiter, an employee of Dan Dugan Transport Company (Dugan), arrived with Dugan's truck at the Santee school grounds to deliver propane fuel into the school's underground storage tank. He parked the truck near a fence that surrounded a manhole where the intake valves for the storage tank were located. After connecting the hoses from the truck to the storage tank connections, he started the truck engine and commenced pumping the pressurized liquid propane into the pressurized storage tank. After about 20 minutes, he heard a popping noise; upon investigation, he discovered that propane was bubbling up out of the manhole, forming a white cloud that continued to grow until it finally covered most of the truck. Later investigation determined that a storage system connecting line in the manhole had split, allowing the liquid propane to escape. As a fire precaution, Ruiter immediately shut off the truck engine and shut off the valves on the truck to the delivery hoses. The cold temperature of the escaping propane and the cloud prevented him from closing the valves on the storage tank, leaving propane gas escaping from the storage tank. Ruiter went to the rear of the truck, proceeded toward the street, and

called to a man across the street, later identified as Marvin Buzzard, to get the Santee firetruck. Ruiter returned to the truck, and for the first time he saw children standing at the rear of the truck. Ruiter stayed in the truck area until after the explosion. He estimated the time from discovery of the leak to the explosion took 3 to 5 minutes. He received some burns to his body from the explosion.

The children that he saw were Robert J. Hawk, almost 13 years of age; Earl Crane, age 12; Lisa Crane, age 15; John Crane, age 10; Chris Campbell, age 4; Lonnie Campbell, age 7; and Angela Henry, age 6. They had left Robert's home and were walking across the school grounds en route to a nearby playground. The Dugan truck was parked across their path. As they neared the truck, Earl and John went to the front of the truck and Robert and the other children went around to the back of the truck and stood there observing a white cloud emerging under the truck.

Robert testified that he saw a white cloud that looked like burning leaves and asked the truckdriver, who was standing near the truck, "what was wrong." The driver did not answer, but only walked away. Ruiter denies this incident. Robert said that the cloud had a smell that he could not describe, but it was "awful"; that he had never smelled it before; that he did not know anything about propane; and that he did not know it was dangerous.

On cross-examination, Robert admitted that in an earlier deposition he gave answers indicating that the cloud smelled like rotten eggs; that the cooking stove at his home had the same smell, but not as strong; and that he held his nose because of the smell. He also said that he knew the truck was delivering material used to heat the school. On redirect Robert explained that he did not know why there was a smell around the stove at home and that he did not know that the smell was a warning of the presence of propane gas.

Soon, Robert decided to locate John and Earl. He walked up to the white cloud, looked in, and, not seeing anyone, he was walking away when the explosion occurred. In an earlier deposition, Robert had said that he took two steps into the white cloud and then stepped back, when the explosion

occurred. He described the white cloud as feeling cool. It was above 90 °F that day.

Ruiter testified that after noticing the children, who were all standing behind him at the back of the truck, he twice told them that they had better leave "because this would probably explode or it would explode" and that when he turned around the explosion occurred. Ruiter described the gas as having a smell, but the vapor "won't hurt" you when you are in it for a brief time.

Buzzard testified that when he first saw the white cloud, he drove his pickup truck down to the area where the propane facility was. He did not see any children near the truck when he talked to Ruiter, the truckdriver. Buzzard then drove to the fire department, encountering Richard Kitto on the way. By the time Buzzard came out of the fire department, the initial explosion had already taken place. A reenactment of Buzzard's actions, from the time of his first contact with Ruiter until after he came out of the firehouse, was timed to have taken 2 minutes and 45 seconds.

Kitto testified that he had just left the nearby community center building when he exchanged words with Buzzard. At that time he looked toward the Dugan truck and saw one figure that looked like an adult near the cab of the truck and two or three small figures at the back of the truck. He hollered loudly to the children, warning them that it was dangerous. The children did not react to his shouting, and he did not know if they heard him. Seconds after his last yell, the explosion occurred.

Angela Henry, one of the children, who was almost 7 years old at the time of the explosion, testified by deposition that Kitto told them twice to get away, and the explosion occurred right after the last warning. She said that Ruiter never said anything to the children and that all of the children except Lisa and herself were running in and out of the white cloud.

Edward McLean, an industrial engineer with 47 years of experience with propane systems, including 12 or 14 propane leaks similar to this case, described the changes in the leaking propane:

>What takes place is . . . the liquid is escaping under pressure. Whatever the temperature of the gas is in there

creates a pressure and on a hot day it could go as high as 140 pounds per square inch, that would be an 80 degree day. So with that kind of pressure squirting this liquid out even through a narrow opening it's still liquid at that point but as soon as it hits the atmosphere at the lower pressure it tends to vaporize. The vaporization is not complete and so in seeking warm air to boil this liquid there is a fog created just like a fog up on the lake here. That same type of fog is consistent of a lot of bubbles that haven't vaporized. It's simply breaking down of the liquid structure from a white, colorless liquid, like water, to a fog and when that is created it's seeking temperature to boil it into a colorless gas. And so that's why we have the fog that we talk about as having been created in this instance that—we have these small particles are seeking heat to boil at the outside temperature into a gas and, again, we're talking about seeking of about a thousand BTU of heat for every gallon of liquid that escapes.

It forms a fog.

Q- . . . Can the average individual be within the vapor area without really knowing it?

A- No.

Q- Can you see— I guess, does some of it become invisible toward the outer edge?

A- Yes, outer edge is where it gets enough temperature to vaporize these little fog bubbles, sure. It then turns into a gas and it's colorless.

Q- That's what I mean. So at the outer perimeters it can be there and you can't see it; is that right?

A- That's right.

Q- So you might think you're standing along the edge and you are actually standing in it?

A- Well, you wouldn't be standing in it very long because you can't breathe very well. You get out of it as soon as you realize that you're in it. You get farther away from it. But you see, it has no oxygen and therefore your lungs won't take it. But from the standpoint of the gas being formed, there is gas outside of this vapor fog, yes.

Q- Once that is ignited, if you are in it do you have any

chance at all to get out of it?

A- No, it's very fast. You can't run that fast.

A later investigation at the site revealed a crack in a pipe near the hub of a valve on the school's propane storage system. This pipe, which was the cause of the propane leak, the explosion, and Robert's injuries, was shown to be a "Schedule 40" type pipe, and the evidence established that it should have been a heavier "Schedule 80" pipe. Since DLR dismissed its cross-appeal on the trial court's failure to grant a directed verdict, no further facts are shown concerning the liability issue.

From the explosion and fire, Robert received extensive and severe burns to most of his body, requiring months of hospital care and medical expenses in excess of $84,000. There was evidence, if believed, showing he had other permanent injuries and damages exceeding $500,000.

Dugan, an original party defendant, was dismissed as a party during the trial.

We first discuss the issue of contributory negligence.

> "The special standard to be applied in the case of children arises out of the public interest in their welfare and protection, together with the fact that there is a wide basis of community experience upon which it is possible, as a practical matter, to determine what is to be expected of them. . . ."

*Camerlinck v. Thomas*, 209 Neb. 843, 858, 312 N.W.2d 260, 268 (1981).

> "If the actor is a child, the standard of conduct to which he must conform to avoid being negligent is that of a reasonable person of like age, intelligence, and experience under like circumstances." . . .
>
> . . . .
>
> ". . . Likewise to be taken into account are the circumstances under which the child has lived, and his experience in encountering particular hazards, or the education he has received concerning them. . . ."

*Id.* at 858-59, 312 N.W.2d at 268.

What is required of a minor is the exercise of that degree of care which an ordinarily prudent child of the same capacity to appreciate and avoid danger would use in the same situation.

*Caradori v. Fitch*, 200 Neb. 186, 263 N.W.2d 649 (1978); *Camerlinck v. Thomas, supra.*

"Negligence must be measured against the particular set of facts and circumstances which are present in each case." *Krehnke v. Farmers Union Co-Op. Assn.*, 199 Neb. 632, 638-39, 260 N.W.2d 601, 606 (1977).

"Knowledge is fundamental to liability for negligence. The very concept of negligence presupposes that the party charged therewith either fails to foresee an unreasonable risk of injury to another, or could have foreseen it had he conducted himself as a reasonably prudent person." *Farmer v. S.M.S. Trucking Co.*, 180 Neb. 779, 782, 145 N.W.2d 922, 924 (1966).

[T]he question of the existence of negligence or contributory negligence is for the trier of fact whenever different minds may reasonably draw different conclusions from the evidence . . . . It is only when the facts are conceded, undisputed, or are such that reasonable minds can draw but one conclusion therefrom that the trial court must decide the question as a matter of law and not submit it to the jury.

*Fangmeyer v. Reinwald*, 200 Neb. 120, 124-25, 263 N.W.2d 428, 431 (1978).

" 'Where contributory negligence is pleaded as a defense, and there is no competent evidence to support it, it is prejudicial error to submit to the jury issues involving contributory and comparative negligence.' " *Oberhelman v. Blount*, 196 Neb. 42, 45, 241 N.W.2d 355, 358 (1976).

"Foresight, not retrospect, is the standard of diligence. It is nearly always easy, after an accident has happened, to see how it could have been avoided. But negligence is not a matter to be judged after the occurrence. It is always a question of what reasonably prudent men under the same circumstances would or should, in the exercise of reasonable care, have anticipated."

*Lock v. Packard Flying Service, Inc.*, 185 Neb. 71, 73-74, 173 N.W.2d 516, 518-19 (1970).

The court's instruction No. 2 relating to the issues, burden of proof, and affirmative defenses generally follows NJI 2.02, including the affirmative defense of contributory negligence:

a. Plaintiff's ward Robert J. Hawk was himself negligent in one or more of the following particulars:

1. In failing to leave an area which he knew, or in the exercise of reasonable care should have known, was dangerous;

2. In going from a place of safety to a place of danger;

which were the proximate cause or a proximately contributing cause of his damages.

As to the second allegation of contributory negligence, "In going from a place of safety to a place of danger," there is no supporting evidence as to either the description, location, or limits of a safe area; however, the giving of that instruction was not prejudicial to plaintiff, since it is generally included in the first allegation of contributory negligence.

This limits the first claimed error to the statement, "In failing to leave an area which he knew, or in the exercise of reasonable care should have known, was dangerous."

In addition to the defendant's burden to prove this particular allegation of contributory negligence as fixed by the court's instructions, the unusual circumstances of this case require supporting evidence of (1) the location, description, and attributes identifying the alleged "dangerous area," and (2) the time when and if Robert became aware of being in the dangerous area.

Witness McLean testified that the gas continued to have dangerous burning capabilities after it mixed with air and became clear; the gas in all forms may have covered 50,000 square feet at the time of the explosion. Although the evidence does not establish any definitive limits of a "dangerous area" or "dangerous areas" before the explosion, it is clear that the known area affected by the after-the-fact explosion of the gas was a dangerous area which included an area 20 feet from the truck where Ruiter, the children, and Robert were standing at the time. Robert was always in that area from the time of his arrival until the explosion.

The only direct evidence about Robert's knowledge and awareness of the dangerous area is his own testimony that he did not know what propane was, that he did not know the area around the truck where he was standing and walking was

dangerous, and that he did not know the propane cloud was dangerous. At most, when he arrived he observed the white cloud, under the truck, that looked like burning leaves, and, exercising a child's inquisitive nature concerning this first-time situation, he asked Ruiter "what was wrong." At most, that question recognized an unusual circumstance not before seen by him; it was not a recognition of either danger or being in a dangerous area.

That brings us to the alternative questions. In the exercise of reasonable care, should Robert have known that he was in a dangerous area, and, if so, when should Robert have so known? These questions should be measured by the knowledge of a reasonable person under like circumstances.

Robert was almost 13 years of age at that time. His IQ was at least average, although he had a reading disability and he was about to repeat the sixth grade in school. He had no special skills or interests. He lived on the Santee Indian Reservation with his mother, Ardith Hawk.

The explosion scene, as it developed, was very unusual. First, none of the propane properties were known to Robert, and little was generally known to the public except that it was a heating fuel stored in tanks under pressure. Certainly, the changes that occurred to liquid propane when it was exposed to the open air, as described by McLean, were not generally known by the public or Robert. The leaking propane gas created an emergency situation that resulted in an explosion in about 3 minutes after Robert came upon the scene. The only adult present was the driver, Ruiter, who stayed around the truck as did Robert and the other children. Ruiter never left or attempted to leave the truck area, and he made no effort to get the children to leave except his warning, which occurred immediately before the explosion. The 3-minute time element and the fact that the adult, Ruiter, stayed in the truck area are important circumstances when considering Robert's conduct.

Defendant relies on Robert's testimony that he knew that the material coming out of the Dugan truck was used to heat the school; that the white cloud smelled bad; and that when he was in it, it was cool and he held his nose. Also, in retrospect, Robert admitted that the unlighted gas from the family

cookstove at his home smelled the same as the white cloud, but not as strong. None of this evidence identifies the explosive capabilities of propane gas under the existing circumstances.

There is evidence concerning warnings given to Robert and the children. Kitto testified that he yelled a warning to the children, but he did not know if they heard him. Angela Henry testified that she heard Kitto tell them twice to "get away." Robert did not hear such warnings. Ruiter testified that he warned the children. Whether or not these were effective warnings of the danger need not be determined, since in both instances the evidence shows that the explosion occurred within seconds (Kitto) or immediately (Ruiter), and for a warning to be effective it must be given in time to allow the person so warned to protect himself. *Schmidt v. Orton*, 190 Neb. 257, 207 N.W.2d 390 (1973).

After favoring defendant with resolution of conflicts and all reasonable inferences, we find that reasonable minds can draw but one conclusion, that Robert J. Hawk, under the circumstances, exercised the degree of care required of him, a child just under 13 years of age, *Camerlinck v. Thomas*, 209 Neb. 843, 312 N.W.2d 260 (1981), and that he neither knew nor in the exercise of reasonable care should have known that he was in an area that was dangerous. For those reasons, the issue of Robert's contributory negligence should not have been given to the jury. Further, absent a special verdict on the issue, the giving of the companion instruction on comparative negligence was prejudicial to plaintiff on the issue of damages.

It is not necessary to discuss the other assigned errors.

Since the jury verdict established the liability of defendant, DLR, this cause should be remanded for a new trial on the limited issue of damages.

REVERSED AND REMANDED FOR A NEW TRIAL
ON THE ISSUE OF DAMAGES.