ANDREW SCOTT BALDWIN, APPELLANT, V. CITY OF OMAHA, A
MUNICIPAL CORPORATION AND POLITICAL SUBDIVISION OF THE
STATE OF NEBRASKA, APPELLEE.
607 N.W. 2d 841

Filed March 24, 2000.    No. S-97-986.

E. Terry Sibbernsen and Mandy L. Stringenz, of E. Terry Sibbernsen, P.C., and Sheldon Bross, of Bross Strickland, Cary & Grossman, for appellant.

Thomas O. Mumgaard and Michelle A. Peters for appellee.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.
Andrew Scott Baldwin filed the instant action against the City of Omaha (City) under the Political Subdivisions Tort Claims Act, Neb. Rev. Stat. § 13-901 et seq. (Reissue 1991 & Cum. Supp. 1992), in which he seeks recovery for injuries sustained

from a confrontation with the Omaha police on September 5, 1992. Following a bench trial, the district court found that there were two causes of the injuries suffered by Baldwin on September 5: the negligence of the City and the contributory negligence of Baldwin for discontinuing his prescribed medication while aware of the risks of doing so. The court, in comparing the negligence, determined that Baldwin's contributory negligence was the greater cause of the injuries and entered a judgment of dismissal in favor of the City and against Baldwin. For the reasons that follow, we affirm the judgment of the district court.

## FACTS

### EVENTS PRIOR TO SEPTEMBER 5, 1992

The evidence reveals that Baldwin became a student at the University of Nebraska-Lincoln (the University) in the fall of 1988, where he received a full athletic scholarship to play football. In 1991, Baldwin began the football season as a starting running back for the University, but suffered a number of injuries that prevented him from playing the entire season. The University's football team played in the Orange Bowl in Miami, Florida, following the 1991 season. In January 1992, after accompanying the team to Miami, Baldwin became increasingly depressed about not being able to play football. Although Baldwin testified that he had no mental problems prior to that time, Baldwin's mental condition deteriorated rapidly and significantly on January 18. While riding in a car in Lincoln with other teammates on that date, Baldwin jumped out of the car and ran toward the Lincoln Municipal Airport in a futile effort to return to his family in New Jersey. Shortly thereafter, Baldwin ran naked through a residential neighborhood and came upon a woman who was walking her dog. Baldwin beat her severely and fought with at least three Lincoln police officers who were called to the scene.

Baldwin was subsequently charged in the Lancaster County District Court with first degree assault on the woman and third degree assault on one of the Lincoln police officers. During the course of the criminal proceedings, Baldwin was hospitalized at the University of Nebraska Medical Center, where Baldwin was

treated primarily by Dr. Donald Swanson, a board-certified psychiatrist. Swanson diagnosed Baldwin as having a severe mental illness, specifically, major depression with psychotic features. Swanson described the psychotic features as those aspects of a patient's condition which leave him out of touch with reality. Swanson concluded that medications were necessary to control Baldwin's condition. On June 10, 1992, Baldwin was found not responsible for either assault by reason of insanity; however, the Lancaster County District Court retained jurisdiction over Baldwin to oversee an appropriate mental health treatment plan which was to be developed and implemented by Swanson.

While the actual mental health treatment plan was not admitted into evidence in the instant case, the district court found that the Lancaster County District Court had insisted on safeguards against further violence and that mandatory compliance was expected of Baldwin. Swanson testified in the instant case that Baldwin was "somewhat hesitant" about fulfilling his drug regimen and that Swanson explained to Baldwin that noncompliance could result in Baldwin's being readmitted to the hospital.

Swanson continued to serve as Baldwin's primary psychiatrist and treated Baldwin regularly through September 1992. During that time, Swanson monitored Baldwin's symptoms, adjusted Baldwin's medication (lithium carbonate) accordingly, and was the only physician prescribing medication to Baldwin. Swanson testified that he spoke with Baldwin about the lithium carbonate's uncomfortable side effects (nausea being the most common) and instructed Baldwin on how to deal with such side effects. According to Swanson, Baldwin showed "no explosive symptomology," but experienced varying degrees of depression on different occasions between April and September 1992. Swanson said that blood samples taken from Baldwin once a month indicated that the levels of lithium carbonate in Baldwin's system were always "within the therapeutic range."

Baldwin acknowledged that he was prescribed certain medications for his psychiatric condition between January and September 1992 and that he took the medications during the summer of 1992. Baldwin said that he understood that the purpose of the medication was to prevent him from having psychotic episodes. Baldwin testified that he "could understand

things" and could read and comprehend instructions while taking the medication.

Baldwin planned to refrain from playing football during the 1992 season. Since he was still interested in returning to college football in 1993, Baldwin continued physical workouts and training on his own during the summer of 1992. Baldwin felt, however, that the lithium carbonate interfered with his workouts, particularly insofar as it seemed to cause dry mouth, dizziness, nausea, and cramping in Baldwin's arms and legs.

Although Baldwin could recall the events of January 18, 1992, he was not concerned about the possibility of such an episode recurring because he "knew for sure" what his frame of mind was during that episode and he "could deal with it." Baldwin said that he discussed strategies to deal with "psychotic feelings" with his psychiatrist and that such strategies were explored in the context of Baldwin's continuing to take his medication.

The Lancaster County District Court held an evidentiary hearing on August 24, 1992, to determine whether Baldwin presented a danger to himself or others and whether Baldwin should be committed for treatment at an appropriate facility. Swanson examined Baldwin on August 27 and noted that Baldwin "expressed some anger and hostility" about having to continue treatment. Based on evidence presented at the evidentiary hearing, the Lancaster County District Court found that Baldwin presented a danger to himself and others and ordered Baldwin committed to the St. Joseph Center for Mental Health (St. Joseph Center) in Omaha on September 2. At the same time, the Lancaster County District Court permitted St. Joseph Center to allow Baldwin to leave this facility if St. Joseph Center determined that releasing Baldwin was "consistent with the safety of the public."

On September 2, 1992, Baldwin and Swanson reviewed the district court's order, and Swanson noted that Baldwin was frustrated, angry, and embarrassed by that day's events. Swanson also conducted a "mental status exam" on Baldwin that day, but did not have a blood test performed to determine whether Baldwin had been taking the lithium carbonate. Swanson said that Baldwin was in compliance with the drug regimen as late as August 27 and that a blood test was scheduled for September 8.

Swanson testified that Baldwin still suffered from a major mental illness on September 2, 1992, but concluded that Baldwin appreciated the risks of noncompliance with his drug regimen. Moreover, Swanson said that he had explained those risks to Baldwin that very day.

Swanson also testified that lithium is a mood stabilizer and it was not likely that Baldwin would be able to adequately control his moods or psychotic symptoms if Baldwin went without the lithium carbonate for a period of 2 to 4 days.

Nevertheless, according to Swanson, Baldwin secretly stopped taking the lithium carbonate sometime prior to September 2, 1992. Without saying precisely when, Baldwin confirmed at trial that he had stopped taking the medication sometime during the week prior to September 5. Baldwin said he did so because he "felt better about" himself and "had things in front of" him. Moreover, Baldwin said he believed he could recognize the frame of mind that he had experienced prior to his previous psychotic episode and would be able to control it if he started getting into such a frame of mind again.

After discussing Baldwin's case on September 2, 1992, Swanson and the medical director for St. Joseph Center concluded that Baldwin posed no danger and discharged Baldwin to outpatient treatment that day. Baldwin did not want to attend the season-opening Nebraska football game in Lincoln on September 5 and decided instead to attend a different football game at the University of Nebraska-Omaha with Mickey Joseph, a former teammate. Baldwin admitted that he did not take his medication on that specific day.

### EVENTS OF SEPTEMBER 5, 1992

Joseph testified that Baldwin started "getting paranoid" at the University of Nebraska-Omaha football game, so Joseph and Baldwin set out to visit the home of a mutual friend. As Joseph and Baldwin drove along Interstate 480, Baldwin told Joseph that he missed his mother and opened the car door. Joseph held Baldwin by the shirt and pulled the car over to the shoulder of the Interstate. Baldwin jumped from the car while it was still moving and lay on the highway in the middle of the traffic lane.

Joseph managed to get Baldwin back into the automobile and exited the Interstate. However, Baldwin dashed from the car

when Joseph stopped at a traffic light in Omaha. Joseph pursued Baldwin but could not keep up. Joseph then called the 911 emergency dispatch service (radio dispatch) and informed the operator that Baldwin was "running around," needed help, and had "had problems in the past."

Baldwin testified that he was hearing voices on September 5, 1992, and felt a need to get out of Omaha and back to New Jersey or to Africa. At 11:22 p.m., a caller to radio dispatch reported a disturbance at the Stage II Lounge, mentioned Baldwin's name, and told the operator that assistance was needed "right away." Two minutes later, an operator for radio dispatch broadcast an "A-Adam disturbance" at the Stage II Lounge. The term "A-Adam" in such a broadcast is used to alert patrol officers that a mentally ill person is involved.

Omaha police officers Peggy Lynn Truckenbrod and Anna Doyle responded to the "A-Adam" call. Truckenbrod and Doyle, who were riding in the same patrol car that night, had both received instruction concerning the policies and procedures of the Omaha Police Division (Division) for dealing with mentally ill persons. Those policies and procedures include admonishments to avoid creating unnecessary ill will, to be polite and respectful, to refrain from being in a hurry, and to establish a relationship of concern and understanding. Similarly, both officers had received instructions concerning the Division's policy on the use of force. That policy authorizes officers to fire their weapons in order to "protect the police officer or others from what is reasonably believed to be an immediate threat of death or serious bodily harm."

At the Stage II Lounge, Truckenbrod and Doyle learned that Baldwin was the cause of the disturbance. Truckenbrod had heard of Baldwin and the Lincoln assault prior to that evening, but did not know specific details about that event. Around 11:37 p.m., Truckenbrod and Doyle discovered that Baldwin had discarded his clothes and was "running around naked." About that time, Truckenbrod requested that radio dispatch send a backup car specifically because she knew the "A-Adam" party was Baldwin. Radio dispatch complied by instructing Omaha police officer Thomas Muller to assist Truckenbrod and Doyle—of

which information both Truckenbrod and Doyle were aware prior to encountering Baldwin.

While searching for Baldwin, Truckenbrod informed Doyle that Baldwin had "assaulted a female" in Lincoln, that it took "quite a few" police officers to subdue Baldwin in Lincoln, and that Baldwin had been treated for mental illness. Doyle became concerned about subduing Baldwin because of his size and strength. Truckenbrod and Doyle, however, did not discuss any plan regarding how to handle the situation once they located Baldwin.

At approximately 11:44 p.m., Truckenbrod and Doyle found Baldwin and informed radio dispatch that Baldwin was trying to jump through the plate glass door of a house. Truckenbrod became concerned for the safety of spectators in the nearby area and believed that she and Doyle would have to subdue Baldwin by force. As Truckenbrod and Doyle pulled up to the area at 11:45:25 p.m., Doyle exited the patrol car, and Truckenbrod followed without waiting for backup to arrive or ascertaining the estimated time of arrival of such backup. Doyle said to Baldwin, "Omaha Police. Come down off the landing." Baldwin stopped hurling himself at the door and obeyed Doyle. Truckenbrod described Baldwin as "calm" and "not agitated" at that point.

Truckenbrod approached Baldwin and said, "Police, you're under arrest!" Without asking Baldwin any questions about his medical condition or his behavior, Truckenbrod urged Baldwin to step against a nearby wall. Baldwin obeyed, and Doyle told him to put his hands on the wall. From behind Baldwin, Truckenbrod placed her left hand on Baldwin's shoulder and reached for her handcuffs with her right hand while instructing Baldwin to bring his left hand back. Baldwin did not respond.

Doyle told Baldwin to bring his hand back, and Truckenbrod started to reach for Baldwin's left hand with her left hand. At that point, Baldwin turned and pushed both officers away. The officers stumbled, and they wound up struggling with Baldwin on the ground. As they wrestled with Baldwin, the officers radioed for help at 11:45:41 and 11:45:46 p.m.

Truckenbrod felt Baldwin trying to grab her gun with his hand. Truckenbrod said that she kept her hand over her holster to keep Baldwin from getting a hold of the weapon and that

Baldwin's hand was over her hand. When Doyle heard Truckenbrod screaming that Baldwin had Truckenbrod's gun, Doyle placed her gun below Baldwin's left ear and said, "Let go of the gun or I'll shoot." Baldwin did not respond. When Truckenbrod exclaimed, "His hand's on the trigger," Doyle fired one shot from her 9-mm Baretta gun into Baldwin's left side, just below his left armpit. At that moment, Baldwin ceased struggling and Muller, the backup officer, arrived. The gunshot wound left Baldwin permanently paralyzed from the chest down.

## DISTRICT COURT PROCEEDINGS

Baldwin filed the instant action pursuant to the Political Subdivisions Tort Claims Act seeking recovery from the City for the damages he incurred as a result of the September 5, 1992, shooting. Baldwin alleged that Truckenbrod and Doyle were negligent in "failing to follow City of Omaha policy and procedures pertaining to the apprehension and handling of mentally ill individuals such as Andrew Scott Baldwin" and in "failing to wait for additional police officers to arrive at the scene . . . before [attempting] to apprehend Andrew Scott Baldwin." Baldwin also alleged that the Political Subdivisions Tort Claims Act was unconstitutional because of its limitations on damages. The City filed an answer in which it maintained that Baldwin was contributorily negligent in (1) failing to heed the lawful attempt of the officers to place him under arrest, (2) failing to heed the lawful orders of the officers, (3) placing his hands upon an officer's weapon in such a manner as to cause the officer to reasonably believe that Baldwin was attempting to disarm the officer and place the officer in danger, and (4) failing to take his prescribed medication in compliance with directions of his physicians and an order of a court of law when he knew that the failure to do so could result in psychotic episodes during which he was a threat to himself and others.

Following a bench trial, the district court determined that Truckenbrod and Doyle were negligent due to their disregard of the standard operating procedure on dealing with mentally ill individuals and in failing to carefully evaluate the situation prior to attempting to place handcuffs on Baldwin. The district court found that the Division's policies and procedures for handling

mentally ill persons constituted a duty of care and that Truckenbrod and Doyle breached that duty by failing to follow those procedures. The district court also found that the officers' conduct once the struggle began, including the ultimate shooting of Baldwin, was consistent with the Division's procedures on the use of force. However, the district court ruled that the officers' negligence caused the need for using deadly force against Baldwin and was one of the proximate causes of Baldwin's injuries. The officers' negligence was imputed to the City. The court then addressed the alleged contributory negligence of Baldwin.

The district court rejected all of the City's allegations of contributory negligence, except the final one, on the grounds that Baldwin was clearly deranged on September 5, 1992, and could not be held to the knowledge necessary to satisfy the defenses. Addressing the last allegation of contributory negligence, the district court determined that Baldwin "knew or should have known that [failing to take the prescribed medication prior to September 5, 1992,] would lead to psychotic episodes during which [Baldwin] could become a threat to himself or others and during which [Baldwin] was likely to encounter law enforcement officers." The district court found that Baldwin's conduct in failing to take his prescribed medications prior to September 5 was "so willful as to suggest recklessness" and concluded that this negligence was also a proximate cause of Baldwin's injuries. Baldwin's conduct was determined by the district court to be so intentional and egregious that it constituted 55 percent of the causation, as compared to 45 percent on the part of the City. The constitutional question was rendered moot because the district court's apportionment of negligence precluded recovery. Judgment was entered in favor of the City, from which Baldwin timely appealed to the Nebraska Court of Appeals. We subsequently granted Baldwin's petition to bypass the Court of Appeals.

## ASSIGNMENTS OF ERROR

Baldwin assigns, restated, that the district court erred in (1) applying an objective "reasonable person" standard of care to Baldwin instead of a subjective standard due to Baldwin's men-

tal illness, (2) determining that Baldwin's negligence in discontinuing his medication was a proximate cause of Baldwin's gunshot injury, and (3) concluding that Baldwin's contributory negligence was the greater cause of his injuries.

## STANDARD OF REVIEW

In actions brought pursuant to the Political Subdivisions Tort Claims Act, the findings of the trial court will not be disturbed on appeal unless they are clearly wrong, and when determining the sufficiency of the evidence to sustain the judgment, it must be considered in the light most favorable to the successful party. Every controverted fact must be resolved in favor of such party, and it is entitled to the benefit of every inference that can reasonably be deduced from the evidence. *Johnson v. School Dist. of Millard*, 253 Neb. 634, 573 N.W.2d 116 (1998).

## ANALYSIS

### CITY'S NEGLIGENCE

We begin our analysis by noting that the City did not cross-appeal the district court's findings and conclusions of law regarding the officers' negligence in this matter. The district court had concluded that Truckenbrod and Doyle were negligent in disregarding the standard operating procedure on dealing with mentally ill individuals and in failing to carefully evaluate the situation before attempting to handcuff Baldwin. Moreover, the district court determined that the officers' negligence led to the need for using deadly force against Baldwin and was one of the proximate causes of Baldwin's injuries. This determination is supported by the evidence and is not at issue on appeal. The City's negligence will be discussed further in the context of our comparative negligence analysis.

### BALDWIN'S CONTRIBUTORY NEGLIGENCE

Neb. Rev. Stat. § 25-21,185.09 (Reissue 1995) provides, in pertinent part, that in negligence actions accruing on or after February 2, 1992:

> Any contributory negligence chargeable to the claimant shall diminish proportionately the amount awarded as damages for an injury attributable to the claimant's con-

tributory negligence but shall not bar recovery, except that if the contributory negligence of the claimant is equal to or greater than the total negligence of all persons against whom recovery is sought, the claimant shall be totally barred from recovery.

It is well settled that a plaintiff is contributorily negligent if (1) she or he fails to protect herself or himself from injury, (2) her or his conduct concurs and cooperates with the defendant's actionable negligence, and (3) her or his conduct contributes to her or his injuries as a proximate cause. *Humphrey v. Burlington Northern RR. Co.*, 251 Neb. 736, 559 N.W.2d 749 (1997); *Harrison v. Seagroves*, 250 Neb. 495, 549 N.W.2d 644 (1996); *Nickell v. Russell*, 247 Neb. 112, 525 N.W.2d 203 (1995). To entitle a defendant to judgment under the comparative negligence statutory scheme, the defendant has the burden of proving that any contributory negligence chargeable to the plaintiff is equal to or greater than the total negligence of all persons against whom recovery is sought. See § 25-21,185.09.

Baldwin asserts that the district court erred in accepting the defense of contributory negligence and assessing fault against him in the instant case. Baldwin first claims that a mentally ill plaintiff is a unique plaintiff in the eyes of the law and that the district court erroneously applied an "objective" reasonable person standard of care to Baldwin instead of a "subjective" standard that would have considered his mental illness.

After reviewing the record, we cannot agree with Baldwin's characterization, and fundamental premise, that the district court mechanically applied an "objective" reasonable person standard of care to Baldwin in light of the circumstances. Rather, the district court considered Baldwin's mental illness in summarily disposing of the City's first three allegations of contributory negligence by concluding that Baldwin was "clearly deranged" on September 5, 1992, and could not be "held to the knowledge necessary to satisfy" the contributory negligence defenses. With reference to the City's allegation that Baldwin failed to take his prescribed medication in compliance with the directions of his physician and an order of the court, the district court found that

Baldwin had quit taking his prescribed medication on or before September 2 and concluded:

> [Baldwin's] conduct in this regard is remarkable: he was under the jurisdiction of a district court in a criminal proceeding, having just come from a court hearing to the confinement of a hospital room, yet he intentionally stopped taking the medication *which his physician had repeatedly explained was absolutely necessary.* Dr. Swanson testified clearly that, in his opinion, *Baldwin was capable of understanding his instructions.* It is difficult to imagine a more heedless course of conduct.

(Emphasis supplied.)

It is quite apparent that the district court appropriately took into consideration Baldwin's mental illness when assessing the evidence regarding Baldwin's alleged contributory negligence. We briefly digress to discuss why it was "appropriate" for the district court to consider Baldwin's mental illness in assessing his alleged contributory negligence under the circumstances. This court recognizes that two goals of the American tort system are to minimize dangerous conduct and to provide compensation for those that suffer damages. These two goals, however, are held in check in a fault-based regime by the equally important aim of shifting the burden of an injury only if the one to whom the loss is to be shifted was at fault. This fundamental principle requires that neither plaintiffs nor defendants should be held to standards of care which they cannot meet. See W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 4 (5th ed. 1984 & Supp. 1988). In determining liability, our fault-based regime considers not only a deviation from an established standard of conduct but also a plaintiff's or defendant's ability to comply with that standard. See Keeton et al., *supra,* § 32. The district court made precisely that type of assessment regarding Baldwin in the instant case.

The question that the district court had to decide regarding Baldwin's medication noncompliance was whether Baldwin reasonably understood the prescribed drug regimen and the risks of noncompliance at a time prior to September 5, 1992. The evidence reveals that Baldwin understood that the purpose of the lithium carbonate was to prevent him from having psychotic

episodes. Baldwin testified that he "could understand things" and could read and comprehend instructions while taking the medication. Swanson testified that Baldwin's medication had no effects on his cognitive intellectual functions and that Baldwin appreciated the risks of noncompliance with his drug regimen. Swanson discussed the risks of noncompliance with Baldwin on more than one occasion and specifically explained those risks to Baldwin as late as September 2. It was Swanson's opinion that Baldwin was capable of understanding his instructions regarding the drug regimen and that Baldwin appreciated the risks of noncompliance.

The evidence established, when viewed in the light most favorable to the City, that Baldwin, when lucid, could reasonably understand the deterioration of his mental state when he was off his medication, and Baldwin knew of the risks he posed to others when actively psychotic. Thus, at the time of his negligence, on or before September 2, 1992, Baldwin was aware of his mental illness and of the risks involved in not taking his lithium carbonate. This case is similar to those cases involving diabetics or epileptics who ignore the warning signs of an impending blackout and drive a car. See *Storjohn v. Fay*, 246 Neb. 454, 519 N.W.2d 521 (1994) (citing numerous cases in which such conduct is examined and discussed). The fault is not in blacking out but in driving when the person should have perceived the risks and refrained from driving when he or she had not taken the proper medication. Likewise, Baldwin's active fault in the instant case was not on September 5, when he was "explosively" symptomatic, but, instead, the negligence occurred several days prior to September 5 when Baldwin perceived the risks and refused to take his prescribed lithium carbonate.

We realize that Baldwin gave varying explanations of the extent to which he perceived the risks of medical noncompliance and also gave reasons for his discontinuation of the lithium carbonate. However, where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Schwarz v. Platte Valley Exterminating*, 258 Neb. 841,

606 N.W.2d 85 (2000). Applying this principle and the applicable standard of review, we cannot say that the district court's factual determination that Baldwin reasonably understood the prescribed drug regimen and appreciated the risks of noncompliance at the time he discontinued the medication was clearly erroneous.

Baldwin also argues that contributory negligence should not prevent recovery because the City had the last clear chance to avoid the harm inflicted upon him. Assuming without deciding that the last clear chance doctrine has continuing validity in our present comparative fault system, we have consistently required that in order to submit the doctrine of last clear chance to the finder of fact, there must be competent evidence of the doctrine's applicability and the issue must have been raised by the pleadings. See, *Kozeny v. Miller*, 243 Neb. 402, 499 N.W.2d 75 (1993); *Laird v. Kostman*, 229 Neb. 114, 425 N.W.2d 607 (1988). Moreover, " '[t]he doctrine has no application unless the person claiming its benefit puts himself in the position of admitting that immediately before the accident he found himself in a place of peril through his own negligence from which he could not escape by the exercise of ordinary care.' " *Kozeny v. Miller*, 243 Neb. at 407, 499 N.W.2d at 80.

In the instant case, Baldwin did not plead the last clear chance doctrine in his operative petition, nor did he plead sufficient facts which would place the doctrine at issue. At no time throughout this case has Baldwin alleged that his situation was the result of his own negligence. Simply put, the doctrine of last clear chance, regardless of its continued validity, was not properly placed at issue for the district court's consideration.

### PROXIMATE CAUSATION

In his next assignment of error, Baldwin claims that the trial court erred in finding that Baldwin's negligence in discontinuing his medication was a proximate cause of his injuries. Baldwin first asserts that the district court erred in finding that his failure to take the prescribed lithium carbonate caused the psychotic episode on September 5, 1992. Baldwin claims that the district court must have assumed that the discontinuance of the medication caused the psychotic episode because *"the*

*defendant presented no evidence that this cessation actually caused Mr. Baldwin's mental breakdown."* (Emphasis in original.) Brief for appellant at 17. We do not agree.

A proximate cause is a cause that produces a result in a natural and continuous sequence, and without which the result would not have occurred. *Sacco v. Carothers*, 253 Neb. 9, 567 N.W.2d 299 (1997). Determination of causation is ordinarily a matter for the trier of fact. *Kozicki v. Dragon*, 255 Neb. 248, 583 N.W.2d 336 (1998). When reviewing the sufficiency of the evidence to sustain a judgment, we are mindful that every controverted fact must be resolved in favor of the successful party, and such party is entitled to the benefit of every inference that can reasonably be deduced from the evidence. See *Johnson v. School Dist. of Millard*, 253 Neb. 634, 573 N.W.2d 116 (1998).

The evidence is more than sufficient to support the district court's finding that Baldwin's failure to take his lithium carbonate was the proximate cause of Baldwin's psychotic episode on September 5, 1992. Swanson testified that a psychotic episode was foreseeable if Baldwin stopped taking his lithium carbonate. Further, Swanson offered his expert opinion, based upon a reasonable degree of psychiatric certainty, that Baldwin's failure to take his lithium carbonate could have led to the September 5 psychotic episode. Moreover, the testimony of both Swanson and Baldwin supports the inference that Baldwin's medication stabilized his moods and prevented psychotic episodes and that if Baldwin had continued to take the medication, the September 5 episode would not have occurred. The district court was not clearly wrong in this determination.

Baldwin also argues that the failure to take his medication was merely a condition which permitted injury through the subsequent independent acts of Truckenbrod and Doyle. The parties agree, as do we, that this argument is resolved by our reasoning in *Sacco v. Carothers, supra.* Although the primary issue in *Sacco* was the inappropriateness of a particular jury instruction, we analyzed in detail the rules of proximate causation and intervening cause, and our reasoning therein provides guidance for our present determination.

We explained in *Sacco v. Carothers*, 253 Neb. at 17-18, 567 N.W.2d at 306, that a "proximate cause is a cause that pro-

duces a result in a natural and *continuous* sequence, and without which the result would not have occurred." (Emphasis in original.) The district court reasonably inferred from the evidence that if Baldwin had not negligently discontinued his medication, he would not have had a psychotic episode leading to his violent confrontation with the officers on September 5, 1992. This psychotic episode led to Baldwin's personal injuries in a natural and continuous sequence. Of course, Baldwin's negligence alone could not have resulted in the gunshot wound; as the district court found, that result was also brought about by the negligence of the officers. Baldwin maintains that the negligence of the officers was an efficient intervening cause, breaking the causal connection between Baldwin's original negligence and the injury. However, "[t]he doctrine that an intervening act cuts off a tort-feasor's liability comes into play only when the intervening cause is not foreseeable." *Sacco v. Carothers*, 253 Neb. 9, 15, 567 N.W.2d 299, 304 (1997).

As previously explained, Baldwin reasonably understood the deterioration of his mental state when he was off medication, and Baldwin knew of the risk he posed to others when actively psychotic. Baldwin was fully aware of the events of January 18, 1992, in Lincoln, and it was sufficiently foreseeable that discontinuation of his medication would lead to another psychotic episode and another violent encounter with the police; the very conduct he now claims constitutes an efficient intervening cause. See *Sacco v. Carothers, supra.* To constitute want of due care on Baldwin's part, it is not necessary that he should have anticipated the exact harm which occurred; it is sufficient that he knew or should have known that substantial injury was likely to result from his acts. See *Humphrey v. Burlington Northern RR. Co.*, 251 Neb. 736, 559 N.W.2d 749 (1997). The district court, as the trier of fact, considered the evidence and determined that the acts of Baldwin and the officers were both proximate causes of Baldwin's injuries. For the reasons stated, we cannot conclude that the district court's determination was clearly wrong. Baldwin's second assignment of error is therefore without merit.

COMPARISON OF NEGLIGENCE

Baldwin finally claims that the district court erred in applying the provisions of § 25-21,185.09 and apportioning

Baldwin's contributory negligence at 55 percent, thus precluding any recovery in the instant case. Comparative negligence " 'abrogates the common-law concept of contributory negligence, thus relieving both parties of an all-or-nothing situation, and substitutes apportionment of the damages by fault.' " *Traphagan v. Mid-America Traffic Marking*, 251 Neb. 143, 160, 555 N.W.2d 778, 789 (1996) (Gerrard, J., concurring) (quoting John J. Palmer & Stephen M. Flanagan, Heft & Heft's Comparative Negligence Manual § 1.10 (rev. ed. 1986)). Because its purpose is to allow triers of fact to compare relative negligence and to apportion damages on that basis, the determination of apportionment is solely a matter for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by credible evidence and bears a reasonable relationship to the respective elements of negligence proved at trial.

Baldwin argues that the sheer number of negligent acts on the part of the officers alone is enough to suggest that the comparative negligence percentages are incorrect. However, " '[n]egligence must be measured against the particular set of facts and circumstances which are present in each case,' " *Center State Bank v. Dana, Larson, Roubal & Assoc.*, 226 Neb. 408, 415, 411 N.W.2d 635, 639 (1987); the measurement of negligence involves not just the number of acts but also the nature of those acts. The district court, in its 38-page findings of fact and conclusions of law, carefully delineated the negligent acts of each of the officers and Baldwin in determining the apportionment of negligence.

The district court specifically found that Truckenbrod and Doyle were negligent on the night of September 5, 1992, in utterly failing to follow the Division's standard operating procedure on dealing with mentally ill individuals and in failing to wait for assistance to apprehend Baldwin at a time when he was a mentally ill and dangerous person. In arriving at its conclusion, the district court considered a number of factors from the evidence adduced. The court noted that by 11:37 p.m., Truckenbrod and Doyle knew that they were dealing with Baldwin; they were aware of Baldwin's assaultive behavior in Lincoln the preceding January; and they knew that Baldwin was naked and in an obviously mentally disturbed state. The district

court found that the greater the knowledge that the party was Baldwin and the greater the seriousness of his mental condition, the greater the duty to avoid a violent confrontation, i.e., the greater the duty to heed standard operating procedures and get backup assistance. The court also found that standard procedures would have been particularly useful at one key point in the confrontation, when Baldwin had come down the steps and had obeyed the officers.

The court stated that if the Division's procedures had any meaning at all, it should have been in that interval when Baldwin had obeyed the officers and before the officers attempted to place handcuffs on him. With reference to the shooting itself, the district court found that the die was cast once the struggle began. The officers' conduct, once they were presented with the very real threat of Baldwin's attempts to grab Truckenbrod's gun, was consistent with state law and the Division's procedures on the use of force. In sum, the district court considered the officers' negligence in each of the particulars described above and specifically considered that the officers' negligence caused, in part, the need to use deadly force on Baldwin that night.

On the other hand, the district court determined that Baldwin was contributorily negligent in failing to take his lithium carbonate at a time when Baldwin understood the prescribed drug regimen and appreciated the risks of noncompliance. The court noted that Baldwin's refusal to take his medication was particularly remarkable because he was under the jurisdiction of the Lancaster County District Court in a criminal proceeding and had just come from a court hearing to the confinement of a hospital room, yet, he nonetheless intentionally stopped taking the lithium carbonate which his physician, Swanson, had repeatedly explained was absolutely necessary. The court pointed to Swanson's testimony that, in his opinion, Baldwin was clearly capable of understanding his instructions. The district court concluded that Baldwin's conduct was "so willful as to suggest recklessness" and determined that his contributory negligence was "so egregious" that it constituted 55 percent of the causation of the damages suffered by Baldwin on September 5, 1992.

From our review of the record, we cannot say that the district court's findings regarding the relative negligence of the parties are not supported by credible evidence. The dissent, while acknowledging that the apportionment of damages is solely a matter for the fact finder, would conclude that there is no reasonable relationship between the district court's findings regarding the relative negligence of the parties and the elements of negligence proved at trial. This we cannot do. To the contrary, recognizing our appellate standard of review, we observe that the findings of the district court are extraordinarily detailed and conclude that the court's apportionment determination bears a reasonable relationship to the respective elements of negligence proved at trial.

The district court fully considered the negligent acts of the officers and determined, correctly in our view, that the failure to follow the Division's procedures prior to the actual physical struggle with Baldwin was a significant contributing cause leading to the injuries suffered by Baldwin. While acknowledging that this was a "close case," the district court determined that Baldwin's failure to take his medication at a time when Baldwin understood the prescribed drug regimen and appreciated the risks of noncompliance was a greater cause of the tragic acts that culminated in his injuries.

We cannot disagree with the district court's assessment that Baldwin's conduct on or before September 2, 1992, and his continuing medical noncompliance through September 5, was so willful as to suggest recklessness. Baldwin himself was well aware of the dangerous propensities caused by his mental illness and appreciated the risks of noncompliance at the time he chose to discontinue taking his medication. We recently discussed "reckless indifference to safety" as meaning more than want of ordinary care; it implies a rash and careless spirit, not necessarily amounting to wantonness, but approximating it in degree—a willingness to take a chance. *Collins v. General Casualty*, 258 Neb. 852, 606 N.W.2d 93 (2000). Although Baldwin gave reasons, including physical discomfort, for his discontinuation of the lithium carbonate, we conclude that a mentally ill person who is aware of his or her potential for dangerousness has an obligation to the general public, if not to him-

self or herself, to comply with an appropriate treatment regimen that will stabilize or maintain his or her mental health. That obligation was knowingly breached in the instant case, and we cannot say that the factual determinations by the district court were clearly wrong, or that the court's findings regarding the relative negligence of the parties were not supported by credible evidence.

## CONCLUSION

The district court concluded that the active and continuing negligence of Baldwin and officers of the Division directly contributed to the tragic injuries suffered by Baldwin on the night of September 5, 1992. For the reasons stated, we cannot say that the factual determinations by the district court regarding negligence and proximate causation were clearly wrong. Moreover, the district court's findings regarding the relative negligence of the parties are supported by credible evidence and bear a reasonable relationship to the respective elements of negligence proved at trial. Given the foregoing conclusions, it is not the function of an appellate court to reapportion damages. We, therefore, affirm the district court's judgment of dismissal entered in favor of the City and against Baldwin.

AFFIRMED.

HENDRY, C.J., not participating.

WRIGHT, J., dissenting.

Sometime prior to September 2, 1992, Baldwin stopped taking his medication, which medication caused him to suffer dizziness, nausea, and cramping in his arms and legs. The evidence established that Baldwin's failure to take his medication could have led to the psychotic episode of September 5. Therefore, I agree with the district court's conclusion that Baldwin was negligent in not taking his medication.

However, I respectfully disagree with the district court's conclusion that Baldwin's conduct of not taking the medication was so willful as to suggest recklessness and so egregious that it constituted 55 percent of the causation of the damages Baldwin suffered and therefore precluded recovery. In my opinion, the facts do not support that conclusion.

The officers who attempted to arrest Baldwin knew of his prior episode and assault in Lincoln. They also knew that it had taken numerous Lincoln police officers to subdue Baldwin on that occasion.

The district court found that by September 5, 1992, Baldwin had no control over his actions. At 11:22 p.m. on that date, police were dispatched to an "A-Adam disturbance," which meant that a mentally ill person was involved.

In dealing with mentally ill persons, the Division's policies and procedures required that officers avoid creating unnecessary ill will. Officers were to refrain from being in a hurry and were to establish a relationship of concern and understanding with the person involved. None of these procedures were followed.

At 11:37 p.m., Truckenbrod and Doyle discovered Baldwin was "running around naked." They radioed for backup because they had heard of Baldwin and were aware of the incident that had occurred in Lincoln. Doyle was concerned about subduing Baldwin because of his size and strength, yet the officers did not discuss how they planned to handle the situation.

At 11:44 p.m., Truckenbrod and Doyle informed radio dispatch that Baldwin was trying to jump through the glass door of a residence. At this point, the officers were concerned for the safety of spectators and believed they would have to subdue Baldwin by force. However, when Baldwin was directed to come down off the landing and to stop hurling himself at the door, he complied. Baldwin was calm and not agitated.

However, at 11:45:25 p.m., these officers, knowing Baldwin's size and strength, and without waiting for backup, attempted to subdue Baldwin by force. Contrary to police policy, Truckenbrod approached Baldwin and stated, "Police, you're under arrest!" Truckenbrod told Baldwin to step up against a nearby wall, and Baldwin complied. Then, Truckenbrod attempted to restrain Baldwin by grabbing his left hand and attempting to handcuff him from behind. Baldwin then pushed the officers away. The officers stumbled and ended up struggling with Baldwin on the ground.

This struggle began within 20 seconds of the time that Baldwin had come down off the landing at the direction of the officers. During that 20 seconds, the officers did not follow any

of the required procedures, and as a result, they found themselves in a life-and-death struggle with Baldwin. Without backup, they were not capable of physically restraining Baldwin, and he was shot as he grabbed for Truckenbrod's gun.

The question is, Whose negligence is greater, Baldwin's or that of the officers? The City alleged that Baldwin was contributorily negligent in (1) failing to heed the lawful attempt of the officers to place him under arrest, (2) failing to heed the lawful orders of the officers, (3) placing his hands on an officer's weapon in such a manner as to cause the officer to reasonably believe that Baldwin was attempting to disarm the officer and place the officer in danger, and (4) failing to take his prescribed medication.

The district court determined that the officers were negligent in disregarding the standard operating procedure for dealing with mentally ill individuals and in failing to carefully evaluate the situation prior to attempting to place handcuffs on Baldwin. The court found that the Division's policies and procedures for handling mentally ill persons constituted a duty of care and that the officers breached that duty by failing to follow those procedures. The court also found that the officers' negligence caused the need for using deadly force and was one of the proximate causes of Baldwin's injuries.

The district court rejected the City's first three allegations of contributory negligence on the grounds that Baldwin was clearly deranged and could not be held to the knowledge necessary to satisfy the defenses. However, the court found that Baldwin's negligence in failing to take his medication was greater than the negligence of the officers who failed to follow the standard operating procedure. In my opinion, the district court was clearly wrong.

The evidence is not disputed that in less than 2 minutes from the time the officers engaged Baldwin, they attempted to subdue and handcuff him, contrary to police policy and procedure. In less than 20 seconds from the time that Baldwin complied with Doyle's command that Baldwin come down off the landing, the officers attempted to subdue and handcuff him, also contrary to policy.

The officers knew that because of Baldwin's size, backup was needed. They were aware of Baldwin's assault in Lincoln, and they knew that it had taken quite a few officers to subdue him. They were also aware that Baldwin's size, weight, and strength greatly exceeded their own. However, despite knowing that several police officers would be needed to physically subdue Baldwin if he resisted, Truckenbrod and Doyle attempted to handcuff and subdue Baldwin in less than 2 minutes after they had engaged him.

The apportionment of damages on the basis of the relative negligence of the parties is a matter for the trier of fact. In this case, the officers failed to follow the Division's standard operating procedure for dealing with mentally ill individuals and failed to wait for backup even though they knew Baldwin was mentally ill and dangerous. As the district court noted, if the Division's procedures had any meaning at all, they should have been employed after Baldwin obeyed the officers by coming down from the landing and before the officers attempted to subdue him with handcuffs. I would reverse the judgment and remand the cause with directions to reapportion the liability in favor of Baldwin and to award damages accordingly.

CONNOLLY, J., joins in this dissent.